**PITNEY BOWES INC., Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE, Defendant.**

**No. Civ.A. 97–3055 (RMU).**

United States District Court, District of Columbia.

Nov. 5, 1998.

16

Aubrey Marshall Daniel, III, Carolyn Hastings Williams, Williams & Connolly, Washington, DC, Melissa Landau Steinman, Ian David Volner, Sr., Veneble, Baetjer, Howard & Civiletti, L.L.P., Washington, DC, for Plaintiff.

Bruce R. Hegyi, Roderick Lynn Thomas, U.S. Attorney's Office, Washington, DC, for Defendant(Mark T. Corbly, United States Postal Service, Windsor, CT, Walter C. Alesevich, United States Postal Service, Washington, DC, I. Scott Bieler, Daniel A. McLaughlin, Brown & Wood LLP, New York City, of counsel).

### MEMORANDUM OPINION

URBINA, District Judge.

## GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND DENYING THE CROSS–MOTIONS FOR SUMMARY JUDGMENT

### I. INTRODUCTION[1]

Plaintiff Pitney Bowes Inc. ("Pitney Bowes") brought this action against Defendant United States Postal Service ("Postal Service") claiming the Postal Service, through the promulgation of regulations, breached an agreement with Pitney Bowes regarding interest income from funds deposited by postage meter customers. Pitney Bowes seeks to enjoin the Postal Service from enforcing its regulations, and seeks judgment against the Postal Service in an amount to be determined at trial plus interest and costs of suit.

This matter comes before the court on the Postal Service's motion to dismiss under Fed. R.Civ.P. 12(b)(1), (6) or, in the alternative, for summary judgment, and Pitney Bowes's cross-motion for summary judgment. Addressing first the Postal Service's motion for dismissal, the court concludes that the 1995 CMRS regulations, which direct postal meter users to send payments for resetting postage meters directly to the Postal Service (rather than to the postage meter resetting companies), constituted neither a change in rate-making nor a change in mail classification. Therefore, the Postal Service need not have sought a recommendation from the Postal Rate Commission. Accordingly, the court the court dismisses, for failure to state a claim upon which relief may be granted, Fed.

R.Civ.P. 12(b)(6), Pitney Bowes's third claim for relief, which alleges that the 1995 CMRS regulations exceeded the Postal Service's statutory authority because the Postal Service did not seek a recommendation from the Postal Rate Commission.

The court also concludes that Congress exempted the Postal Service's 1995 Computerized Remote Meter Resetting System regulations from judicial review. Accordingly, the court dismisses, for failure to state a claim upon which relief may be granted, Fed. R.Civ.P. 12(b)(6), the portion of Pitney Bowes's complaint that substantively challenges the regulations. The court denies the Postal Service's motion to dismiss as it relates to the remainder of Pitney Bowes's complaint.

Turning to the cross-motions for summary judgment, the court concludes that genuine issues of material fact exist, which need be resolved to determine whether a contractual arrangement existed between the Postal Service and Pitney Bowes and, if so, the terms of that contract. Additionally, genuine issues exist, at a minimum, as to Pitney Bowes's reasonable, investment-backed expectations. Accordingly, summary judgment is not appropriate at this juncture on the Fifth Amendment takings claim either. Consequently, the court denies the cross-motions for summary judgment.

### II. BACKGROUND

Pitney Bowes manufactures and rents postage meters. (Am. Compl. at 1.) Postage meters "stamp" letters and parcels with imprints equivalent to postage stamps as the indicia of postage payment. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 4.) In the 1960s Pitney Bowes invented and patented what became known as the Computerized Remote Meter Resetting System ("CMRS"), which it continues to market under the trade name Postage by Phone. (Pl.'s Rule 108(h) Stmt. ¶ 3; Am. Compl. at 1–2.) The CMRS permits postage meter users to reset their meters (*i.e.*, purchase more postage) through telephonic communications at their places of business, rather than mechanically at a post

---

**1.** Pursuant to Fed.R.Civ.P. 58, the court issued a separate Order on November 2, 1998, entering judgment on the motions discussed in this Memorandum Opinion.

office or on-site, and thereby enables postage meter users to obtain immediate access to postage on demand. (Pl.'s Rule 108(h) Stmt. ¶ 3; Def.'s Rule 108(h) Stmt. ¶ 1; Am. Compl. at 1–2.)

In the early 1970s, Pitney Bowes presented its CMRS system to the Postal Service, and proposed that the Postal Service authorize it for use in the United States. (Pl.'s Rule 108(h) Stmt. ¶ 4.) Between then and 1978 Pitney Bowes and the Postal Service exchanged oral and written communications reflecting a variety of proposals involving varied terms relating to the CMRS. (Pl.'s Rule 108(h) Stmt. ¶ 6; Def.'s Rule 108(h) Stmt. ¶ 6.)

In 1978 the Postal Service and Pitney Bowes executed a "Statement of Understanding," which gave Pitney Bowes the right to operate the CMRS. (Am.Compl. at 2; Def.'s Mem. in Supp. of Mot. to Dismiss at 3.). In other words, Pitney Bowes became a meter resetting company. Under the regulatory scheme that followed the advent of the CMRS, customers' payments initially went to the meter resetting companies' lockbox bank, and then to the meter resetting companies' trustee bank. (Def.'s Rule 108(h) Stmt. at ¶ 12; Def.'s Mem. in Supp. of Mot. to Dismiss at 3.) The funds remained with the trustee bank until the customers reset their meters, at which time the funds went to the Postal Service.[2] (Def.'s Rule 108(h) Stmt. ¶ 13; Def.'s Mem. in Supp. of Mot. to Dismiss at 3–4.) For the limited time between when the funds arrived at the meter resetting company's trustee bank and when the funds went to the Postal Service, the funds earned interest, and the meter resetting companies retained that interest. (See Am. Compl. at 3; Def.'s Mem. in Supp. of Mot. to Dismiss at 4; Def.'s Rule 108(h) Stmt. at ¶ 16.)

Following the execution of the 1978 Statement of Understanding, Pitney Bowes entered into an agreement with the Hartford National Bank and Trust Company, which agreed to act as trustee of the CMRS customer advance deposits, and Pitney Bowes agreed to act as the agent of the trustee. (Pl.'s Rule 108(h) Stmt. ¶ 11.) Pitney Bowes also entered into written contracts and trust agreements with the CMRS customers, wherein the customers appointed Pitney Bowes as their agent and expressly waived any claim to interest or other income earned by the trustee bank's investment of their advance deposits. (Pl.'s Rule 108(h) Stmt. ¶ 13.) While the parties dispute the mechanics of the transfer of funds, they appear to agree that the interest earned on the advance deposits ultimately went to Pitney Bowes. (Pl.'s Rule 108(h) Stmt. ¶ 12; Def.'s Rule 108(h) Stmt. ¶ 12.)

Between 1978 and 1995 the CMRS became a commercial success. (Am.Compl. at 2.) Actually, four companies, including Pitney Bowes, had authorization to act as meter resetting companies. (Def.'s Mem. in Supp. of Mot. to Dismiss at 2; Def.'s Rule 108(h) Stmt. ¶ 3) Of these, Pitney Bowes controlled 89% of the market, which consisted of over 1.1 million outstanding CMRS meters as of February 1998. (Def.'s Mem. in Supp. of Mot. to Dismiss at 2; Def.'s Rule 108(h) Stmt. ¶ 4.)

On June 9, 1995, the Postal Service promulgated new regulations governing the CMRS, 60 Fed. Reg. 30,714. (See Def.'s Rule 108(h) Stmt. ¶ 5; Pl.'s Rule 108(h) Stmt. ¶ 21; Am.Compl. at 3; Def.'s Mem. in Supp. of Mot. to Dismiss at 2.) Pitney Bowes's grievance stems from the fact that these 1995 CMRS regulations directed customers to send their payments for postage to a Postal Service lockbox account for processing and transfer to the United States Treasury. (Def.'s Mem. in Supp. of Mot. to Dismiss at 5–6; Def.'s Rule 108(h) Stmt. ¶ 22.) Because the CMRS regulations cut out the meter resetting companies' lockbox banks and trustee banks, Pitney Bowes no longer had the opportunity to retain the customer interest on advance deposits.[3] The 1995 CMRS

---

**2.** The Postal Service has always required that mail bear evidence of postage payment before it will be processed and delivered. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 4.)

**3.** In addition to the interest income on advance payments, Pitney Bowes also charges CMRS customers meter rental fees and meter resetting fees. Additionally, Pitney Bowes makes loans to customers, to cover the purchase of postage, and

regulations also continued to require the meter resetting companies to perform most of the CMRS services. (Am.Compl. at 3.)

Pitney Bowes's amended complaint alleges six causes of action: (1) the Postal Service unjustly enriched itself at the expense of Pitney Bowes and its CMRS customers; (2) the Postal Service, through the promulgation of the CMRS regulations, breached the 1978 Statement of Understanding and related agreements, upon which Pitney Bowes justifiably relied; (3) the Postal Service did not seek a decision from the Postal Rate Commission authorizing the "fee" represented by the interest on advance deposits "appropriated and retained by the Postal Service," thereby exceeding the Postal Service's authority; (4) the CMRS regulations are arbitrary and capricious, in that they do not relate to any legitimate Postal Service purpose; (5) the Postal Service wrongfully appropriated monies, payable to Pitney Bowes pursuant to contractual arrangements between Pitney Bowes and its CMRS customers; and (6) the Postal Service's actions in promulgating the CMRS regulations and breaching the contractual arrangement constituted an unconstitutional taking under the Fifth Amendment. (Am.Compl. at 4, 13–14.) Pitney Bowes alleges jurisdiction under 28 U.S.C. §§ 1331(a), 1339 and 39 U.S.C. § 409(a).

## III. DISCUSSION

### A. Motion to Dismiss

#### i. Standard of Review

 Before a court may decide the merits of a case, the court must first have jurisdiction to hear it. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991) (citing *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). The standard of review for a motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction depends upon the purpose of the motion. *See Freiburger v. Emery Air Charter, Inc.*, 795 F.Supp. 253, 256 (N.D.Ill. 1992); 5A Wright & Miller, Federal Practice & Procedure: Civil 2d § 1361 at 456 (2d

ed.1990). If the motion challenges the sufficiency of the allegations of subject matter jurisdiction, the district court must accept all of the complaint's well-pleaded factual allegations as rue and draw all reasonable inferences from those allegations in the plaintiff's favor. *United Trans. Union v. Gateway Western R. Co.*, 78 F.3d 1208 (7th Cir.1996) (citing *Rueth v. EPA*, 13 F.3d 227, 229 (7th Cir.1993)); 5A Wright & Miller, § 1363 at 456. The plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence. *Darden v. United States*, 18 Cl.Ct. 855, 859 (Fed.Cl.1989); *Kehr*, 926 F.2d at 1409; *Boudreau v. United States*, 53 F.3d 81, 82 (5th Cir.1995).

 A motion to dismiss pursuant to Rule 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court may dismiss a complaint for failure to state a claim only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As with motions under Rule 12(b)(1), the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir.1996).

#### ii. Judicial Review of the Substance of the CMRS Regulations

 Pitney Bowes's fourth claim for relief seeks judicial review of the substance of the 1995 CMRS regulations. The Postal Service alleges the absence of subject matter jurisdiction for this court to hear a challenge to the promulgation and substance of its regulations on the basis that Congress exempted the Postal Service from judicial review. (Def.'s Mot. to Dismiss at 17, 20.)

---

sells or rents peripheral mailing equipment and supplies, which work in conjunction with the

CMRS (and other postage meters). (Def.'s Rule 108(h) Stmt. ¶ 15.)

In constructing its argument, the Postal Service points to section 410(a) of the Postal Reform Act, 39 U.S.C. § 410(a), which exempts the Postal Service from requirements imposed on other governmental agencies by federal law. (Def.'s Mot. to Dismiss at 18.) Section 410(a) provides as follows:

> Except as provided by subsection (b) of this section, and except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service.

39 U.S.C. § 410(a).

In explaining this provision, the Postal Service notes that when creating the Postal Service as an "independent establishment of the executive branch," (Def.'s Mot. to Dismiss at 9.). Congress indicated its desire that the Postal Service operate more like a business than had its predecessor, the Post Office Department. (Def.'s Mot. to Dismiss at 18, citing *Franchise Tax Bd. of Calif. v. U.S. Postal Service*, 467 U.S. 512, 519–20, 104 S.Ct. 2549, 81 L.Ed.2d 446 (1984)).

At the outset, then, this court must decide whether this court has authority to hear Pitney Bowes's challenge of the CMRS regulations. "The district courts shall have original jurisdiction of all civil actions arising under the constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Furthermore, district courts shall have original jurisdiction of civil actions "under any Act of Congress relating to the Postal Service," 28 U.S.C. § 1339, and "all actions brought by or against the Postal Service." 39 U.S.C. § 409(a); *See Concept Automation, Inc. v. United States Postal Serv.*, 887 F.Supp. 6, 8 (D.D.C.1995) (citing *Licata v. United States Postal Serv.*, 33 F.3d 259, 261 (3d Cir.1994)).

In *Concept Automation*, the district court held that these statutes confer subject matter jurisdiction upon district courts to hear challenges to Postal Service regulations. *See* 887 F.Supp. at 8. Faced with a similar section 410(a) issue, the district court further held that the inquiry does not stop there.

[A]lthough the existence of a jurisdiction-conferring statute imports a presumption in favor of the availability of judicial review of an action taken by an administrative agency, *National Ass'n of Postal Supervisors v. United States Postal Serv.*, 602 F.2d 420, 429 (D.C.Cir.1979), the presumption can be overcome by evidence of a legislative intent to foreclose judicial intervention.

*Concept Automation*, 887 F.Supp. at 8. The district court found such evidence of legislative intent existed, and dismissed the complaint for failure to state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6). 887 F.Supp. at 10.

An examination of the applicable statutes reveals congressional intent to remove the power of judicial review over the Postal Service's regulations. *Booher v. United States Postal Service*, 843 F.2d 943 (6th Cir.1998). In this respect, Congress designed the "Postal Reorganization Act of 1970 ... to free postal management from entangling red tape and to concentrate management authority so as to provide an efficient and economical postal system." *Governors of the United States Postal Serv. v. United States Postal Rate Comm'n*, 654 F.2d 108, 109 (D.C.Cir. 1981) (citing H.R.Rep. No. 91–1104, at 5–6 (1970), U.S. Code Cong. & Admin. News at 3649, 3654–3655; S.Rep. No. 91–912, at 4–5 (1970)).

In *Carlin v. McKean*, 823 F.2d 620, 625 (D.C.Cir.1987), the D.C. Circuit interpreted section 410(a) to mean that Congress intended to preclude judicial review of the decision by Postal Service's Board of Governors to dismiss the Postmaster General. In *Carlin*, Paul Carlin, the 66th Postmaster General of the United States, filed suit in district court seeking reinstatement after his 1986 removal by the Board of Governors. The district court found the case non-justiciable and dismissed the complaint. 823 F.2d at 621.

In affirming, the D.C. Circuit initially observed that despite Congress' 1970 reorganization of the Postal Service, it remained a governmental agency. *Id.* at 622. The court further observed that the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et*

seq., 701 et seq., section 701(a), subjects government agencies to judicial review, unless Congress has precluded review or a court would have no law to apply to test the legality of the agency's actions. *Id.* The court recognized the existence of such a preclusion, however, concluding Congress exempted the Postal Service from APA judicial review. "Apart from two very limited exceptions, however, the APA is not applicable 'to the exercise of the powers of the Postal Service.'" *Id.* at 622 (citations omitted).[4] The court also noted that despite the existence of a presumption of reviewability before the enactment of the APA, courts should not "indulge" in the presumption when Congress has explicitly exempted an agency from the APA's coverage. *Id.* at 623.

The rationale behind *Carlin* applies equally to the case at bar. Section 410(a) expressly states that "no" Federal law dealing with public or Federal contracts, property, works, or funds shall apply to the exercise of the powers of the Postal Service. The section 410(a) proscription specifically includes the provisions of chapters 5 and 7 of title 5, which constitute the judicial review provisions of the APA. "It is not disputed that the basis for judicial review is provided by the Administrative Procedure Act. 5 U.S.C. § 704." *Galliano v. United States Postal Serv.*, 669 F.Supp. 488, 494 (D.D.C.1986).

On its face, then, the language of the statute is clear. No Federal law, including the APA, shall apply to the Postal Service's exercise of power. The court holds that this proscription encompasses judicial review of the promulgation and substance of the 1995 CMRS regulations. Consequently, the court holds Pitney Bowes may not challenge the 1995 CMRS regulations. Accordingly, the court grants, for failure to state a claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6), the Postal Service's motion to dismiss Pitney Bowes's fourth claim for relief, which alleges that the CMRS regulations are arbitrary and capricious.[5]

### iii. Postal Rate Commission Recommendation

■ Pitney Bowes's third claim for relief alleges that the CMRS regulations exceed the Postal Service's statutory authority because the Postal Service did not seek a decision from the Postal Rate Commission authorizing the "fee" represented by the interest on advance deposits "appropriated and retained by the Postal Service." The Postal Service responds by arguing that the CMRS regulations do not create a rate or fee.

In determining whether the Postal Service exceeded its authority by promulgating a regulation without seeking a recommendation from the Postal Rate Commission, courts must look to whether the regulation constitutes a change in mail classification. *See Combined Communications v. United States Postal Serv.*, 891 F.2d 1221, 1228 (6th Cir. 1989). "The relevant inquiry, then, in evaluating an ultra vires challenge to a Postal Service regulation is determining whether the regulation in question 'does indeed work a change in the scope of a mail classification, .....' *National Retired Teachers Ass'n*, 593 F.2d at 1363." *Combined Communications* at 1228.

This is so because Postal Reorganization Act of 1970 reserved to the Postal Rate Commission the exclusive authority to change a mail classification. *National Retired Teachers Ass'n v. United States Postal Serv.*, 593 F.2d 1360, 1362 (D.C.Cir.1979) (interpreting 29 U.S.C. § 3623). Thus, any change in ratemaking and classifications must, by statute, be recommended to the Postal Service by the Postal Rate Commission "and would be invalid in the absence of

---

**4.** The list of limited exceptions has grown longer than the two that existed in the 1982 statute cited by the *Carlin* court. The list now includes such exceptions as for the Freedom of Information Act; for the employment of personal assistants for blind, deaf, or otherwise handicapped employees; and for restrictions on the employment of relatives, for example. Nonetheless, none of the limited section 410(a) exceptions presently in effect apply to the case at bar.

**5.** In its fifth claim for relief Pitney Bowes alleges the Postal Service wrongfully appropriated monies, payable to Pitney Bowes pursuant to contractual arrangements between Pitney Bowes and its CMRS customers, on the basis of an invalid regulation. This claim appears ambiguous. To the extent it challenges the validity of the CMRS regulations, it too is hereby dismissed pursuant to Rule 12(b)(6).

such a recommendation. 39 U.S.C. § 3621 *et seq.*" *National Retired Teachers Ass'n v. United States Postal Serv.*, 430 F.Supp. 141, 146 (D.D.C.1977).

Courts have further defined a mail classification as a grouping of mailing matters according to size, weight, content, etc., for the purpose of assigning a specific rate or method of handling. *Governors of the United States Postal Serv. v. United States Postal Rate Comm'n*, 654 F.2d 108, 114 n. 6 (D.C.Cir.1981) (citing *National Retired Teachers Ass'n*, 430 F.Supp. at 146–47). Relevant factors for determining whether a regulation constitutes a mail classification include size, weight, content, ease of handling, and identity of both posting party and recipient. *See Combined Communications* at 1228.

The 1995 CMRS regulations did not impose any new fee or price for the resetting of the CMRS. Further, the regulations imposed no new restrictions on the size, weight, content, ease of handling, identity of mailer and recipient, or other factor relevant to the makeup of a mail classification. *See National Retired Teachers Ass'n*, 430 F.Supp. at 147. Rather, the regulations merely redirected the deposit of funds necessary to the resetting of meters. This falls within the Postal Service's discretion to interpret and implement the process of mail classifications. *See National Retired Teachers Ass'n*, 593 F.2d at 1363.

Thus, the court concludes that the 1995 CMRS regulations constituted neither a change in ratemaking nor a change in mail classification. Therefore, the court concludes the Postal Service need not have sought a recommendation from the Postal Rate Commission. On this basis, the court rules that Pitney Bowes's third claim for relief, alleging the 1995 CMRS regulations exceeded the Postal Service's statutory authority because the Postal Service did not seek a recommendation from the Postal Rate Commission, fails to state a claim for which relief can be granted. Accordingly, the court grants the Postal Service's Rule 12(b)(6) motion to dismiss Pitney Bowes's third claim for relief.

### iv. The Postal Service's Assertion of Sovereignty and the "Unmistakability" Doctrine

In its motion to dismiss the Postal Service also asserts that if, in fact, a contract existed, the promulgation of the 1995 CMRS regulations constituted a sovereign act, which allowed the Postal Service to alter the terms of the contract. In government contract law, the unmistakability doctrine provides that sovereign power governs all contracts subject to the sovereign's jurisdiction and will remain intact unless surrendered in unmistakable terms. *United States v. Winstar Corp.*, 518 U.S. 839, 872–73, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (citing *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986)). "[A] contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act ..., nor will an ambiguous term of a grant of contract be construed as a conveyance or surrender of sovereign power." *Id.* 116 S.Ct. at 2456. The Postal Service asserts that because it did not express such a waiver, the unmistakability doctrine precludes suit.

*Winstar* involved the statutory annulment of contracts entered into in the 1980s between the Federal Savings and Loan Insurance Corporation ("FSLIC") and various private purchasers of failing thrifts. As an incentive to take over these ailing institutions, whose liabilities exceeded their assets, the FSLIC allowed the purchasers to use a special accounting methodology in which the purchasers could designate the excess of their purchase price over the fair value of the thrifts as an intangible asset known as supervisory goodwill. The purchasers could then use this supervisory goodwill to fulfill the federal capital reserve requirements. *Seaboard Lumber Co. v. United States*, 41 Fed. Cl. 401, 413 (Fed.Cl.1998) (explaining *Winstar*).

In 1989, however, Congress passed the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), which disallowed the use of supervisory goodwill in calculating capital reserve assets. Because of

this new law, three of the ailing (and now newly purchased) thrifts fell out of compliance, and two ultimately failed. When the purchasers sued the government for breach of contract, the government asserted the defense that because the government acted as a sovereign when enacting FIRREA, the government as contractor could not be held liable for breach of contract. *Seaboard Lumber Co.*, 41 Fed.Cl. at 413.

In a plurality decision, the Supreme Court ruled in favor of the purchasers. The Court construed the contracts between the purchasers and FSLIC as risk-shifting agreements against any losses arising from future regulatory change. *Winstar*, 518 U.S. at 881, 116 S.Ct. 2432. In this respect, the Court found, the contracts did not "purport to bind the Congress from enacting regulatory measures." *Id.* at 881, 116 S.Ct. 2432. Further, the Court ruled that it would allow damages for breach of such a risk-shifting contract. *Id.* "[W]e hold that the terms assigning the risk of regulatory change to the Government are enforceable, and that the Government is therefore liable in damages for breach." 518 U.S. at 843, 116 S.Ct. 2432.

▪ Courts have struggled with the meaning of *Winstar*.

It is somewhat unclear after the *Winstar* plurality opinion as to the type of contract to which the unmistakability doctrine applies. *See Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1578–79 (Fed.Cir.1997) (noting that plurality found the doctrine inapplicable to risk of loss shifting contracts but that remaining five justices agreed that the doctrine's application is unrelated to the nature of the underlying contract).

*Tamarind Resort Assoc. v. Government of the Virgin Islands*, 138 F.3d 107, 112 (3d Cir.1998). One thing, however, appears certain. When the government through regulation alters the terms of a contract it has with a private entity, the terms assigning the risk of regulatory change to the Government are enforceable and damages for breach may be

awarded. *See* 518 U.S. at 843, 116 S.Ct. 2432.

▪ In the instant case, Pitney Bowes asserts that a contract existed between it and the Postal Service, and the 1995 CMRS regulations caused the Postal Service to breach that contract. (Am.Compl. at 2 Pl.'s Opp'n to Mot. to Dismiss at 3.) As in *Winstar*, cooperation appears to have existed between a federal agency and a private entity, wherein the government sought to benefit from the private entity's undertaking of a commercial activity. In both *Winstar* and the instant case the private entity alleged the existence of a contractual arrangement. In both *Winstar* and the instant case the government exercised its authority as a sovereign to enact law that had the effect of changing the alleged contractual relationship. Based on these parallels, the court believes that *Winstar* applies to the instant case. Accordingly, the court concludes that it must adjudicate Pitney Bowes's contract claims. Thus, the court denies the remainder of the Postal Service's motion to dismiss.[6]

**B. Cross–Motions for Summary Judgment**

**i. Standard of Review**

The district court may enter summary judgment where the moving party demonstrates there is no genuine issue of material fact in dispute and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Once the moving party has presented a properly supported motion, the nonmoving party must go beyond the pleadings to identify evidence that allows a reasonable jury to find in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Drawing from affidavits, depositions, and answers to interrogatories, the nonmovant must identify specific facts indicating that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A court making a summary judgment determination must view the facts in a light

---

**6.** As discussed in an earlier footnote, to the extent that Pitney Bowes's fifth claim for relief constitutes a contract-based claim (and not a

claim based on the validity of the CMRS regulations), the court denies the Postal Service's motion to dismiss the claim.

most favorable to the nonmovant, thus giving the nonmovant the benefit of all reasonable inferences derived from the evidence in the record. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The court's function at the summary judgment stage is not to weigh the evidence, but to determine whether there is sufficient evidence for a reasonable fact finder to return a verdict in the nonmovant's favor and warrant a trial. *See id.*

### ii. Alleged Contractual Agreement

■ Pitney Bowes contends that prior to 1978 it and the Postal Service engaged in oral and written communications regarding the proposed CMRS, wherein it was understood that (1) Pitney Bowes would administer CMRS as the agent of CMRS customers; (2) CMRS customers would maintain advance deposits in accounts that would be debited when the customers reset their meters; (3) the advance payments would sit in a trust fund pending payment for postage to the Postal Service; (4) upon resetting the meter, Pitney Bowes would transfer the funds to pay for the postage to the Postal Service; and (5) Pitney Bowes's compensation would come from both transaction fees for resetting the meters and from interest earned on advance deposits. (Pl.'s Rule 108(h) Stmt. ¶ 6; Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 3, Ex. 4 at pp. 2–3, 33–34, Ex. 5, Ex 9.) The Postal Service disputes that the parties reached such an understanding or agreement prior to 1978, in part due to the varying degrees of authority of individuals addressing the correspondence and oral discussions. (Def.'s Rule 108(h) Stmt. ¶ 6; Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 4, Ex. 5, Ex. 6, Ex. 8, Ex. 9.)

Pitney Bowes further contends that the authorization to operate the CMRS represented an "agreement" between the two parties, evidenced, in part, by two documents: the Statement of Understanding and a letter executed on September 28, 1978, between William Bolger and Fred Allen. (Pl.'s Rule 108(h) Stmt. ¶ 7; Def.'s Mot. for Summ. J. Ex. C; Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 2.) Pitney Bowes contends that the agreement had the following three terms: (1) it allowed the Postal Service to terminate its authorization of the CMRS if the CMRS did not meet revenue protection or other Postal Service requirements. (Pl.'s Rule 108(h) Stmt. ¶ 8; Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 2, Ex. 15.) (2) The agreement required that the Postal Service afford Pitney Bowes notice of and an opportunity to cure any deficiencies cited by the Postal Service as grounds for terminating the authorization of the CMRS. (Pl.'s Rule 108(h) Stmt. ¶ 9; Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1). And, (3) the agreement provided that the terms under which the Postal Service authorized the CMRS could be amended with both parties' consent. (Pl.'s Rule 108(h) Stmt. ¶ 10; Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1.)

The Postal Service contends the Statement of Understanding did not impose any prospectively binding legal obligations on the Postal Service and was "terminable." (Def.'s Rule 108(h) Stmt. ¶¶ 8, 9, 10.) In addition, the Postal Service contends the 1995 CMRS regulations had the aim of improving cash management and financial controls, in order to make the Postal Service more responsive to the needs of its customers and more efficient in its handling of funds. (*See* Def.'s Mem. in Supp. of Mot. to Dismiss at 3; Am.Compl. at 3.)

From this, the court concludes that genuine issues of material fact remain. In this respect, the factual record requires further development to determine whether a contract existed between Pitney Bowes and the Postal Service over the authorization of the CMRS, and, if a contract did in fact exist, certain of its terms. Furthermore, while the parties have provided ample evidence of preliminary discussions leading up to the 1978 authorization of the CMRS, as well as memorializations of the authorization and documentation construing its implementation, they have left important questions unanswered concerning the context of these discussions and communications, the parties' intent and understanding, and the parties' course of conduct regarding the CMRS. Thus, the court concludes that summary judgment is not appropriate at this juncture. Consequently, the court denies the cross-motions for summary judgment.

### iii. Fifth Amendment Takings

The Fifth Amendment commands that property not be taken without making just compensation, and valid contracts constitute property. *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals. *Id.* at 579, 54 S.Ct. 840. A primary consideration in determining whether a governmental action constitutes a taking is "the extent to which the regulation has interfered with distinct investment-back expectations." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *see Hilton Wash. Corp. v. District of Columbia,* 777 F.2d 47, 48–49 (D.C.Cir.1985); *Petrolite Corp. v. United States Envtl. Protection Agency,* 519 F.Supp. 966, 970 (D.D.C. 1981); *cf. Western, Fuels–Utah, Inc. v. Lujan,* 895 F.2d 780, 788 (D.C.Cir.1990).

Pitney Bowes alleges that its property interest in the advance deposits derived from the "thousands of existing contractual arrangements" between it and its customers. To establish a taking, however, Pitney Bowes must also show that it had a reasonable, investment-backed expectation in the property taken. That is, Pitney Bowes must demonstrate that it could expect the advance deposit process to continue and the interest generated thereby would attach to it. In other words, Pitney Bowes must first establish its alleged contractual rights. (*Cf.* Pl.'s Opp'n to Mot. for Summ. J. at 30 (alleging "the Postal Service induced Pitney Bowes into the reliance").) As discussed in detail above, genuine issues of material fact exist with respect to the existence of a contractual relationship. Accordingly, the court concludes that the factual record requires more development on the issue of Pitney Bowes's reasonable, investment-backed expectations. Accordingly, summary judgment would not be appropriate at this juncture on the Fifth Amendment takings claim. Consequently, the court denies the cross-motions for summary judgment.

### IV. CONCLUSION

The court holds that 39 U.S.C. § 410(a) exempts the 1995 CMRS regulations from judicial review. Therefore, Pitney Bowes failed to state a claim upon which relief may be granted with regard to its challenge to the promulgation and substance of the 1995 CMRS regulations. Accordingly, the court grants the Postal Service's motion to dismiss Pitney Bowes's fourth claim for relief, which alleges that the 1995 CMRS regulations are arbitrary and capricious.

The court further concludes that the Postal Service need not have sought a recommendation from the Postal Rate Commission regarding the CMRS regulations. On this basis, the court rules that Pitney Bowes's third claim for relief, alleging the 1995 CMRS regulations exceeded the Postal Service's statutory authority, fails to state a claim for which relief can be granted. Accordingly, the court grants the Postal Service's Rule 12(b)(6) motion to dismiss Pitney Bowes's third claim for relief.

On the basis of the instant case's similarity to *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964, the court concludes that it must adjudicate Pitney Bowes's contract claims. Accordingly, the court denies the remainder of the Postal Service's motion to dismiss.

Regarding Pitney Bowes's contractual and Fifth Amendment taking claims, the court concludes genuine issues of material fact remain. In this respect, the factual record requires further development for a determination of whether a contract existed and, if so, certain of its terms. Further, factual record requires further development for a determination of Pitney Bowes's reasonable, investment-backed expectations. Thus, the court concludes that summary judgment is not appropriate at this juncture. Consequently, the court denies the cross-motions for summary judgment.