**Sandra Jean SIMPSON, Plaintiff,**

v.

**The SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, Defendant.**

**No. Civ.A.00–1722(RMU).**

United States District Court, District of Columbia.

Oct. 31, 2001.

Eric C. Sorenson, New York City, for plaintiff.

Arman Dabiri, Washington, DC, for defendant.

Tarrant Hale Lomax, Washington, DC, former counsel for the defendant.

### MEMORANDUM OPINION

URBINA, District Judge.

#### DENYING THE DEFENDANT'S MOTION TO DISMISS

### I. INTRODUCTION

This matter comes before the court on the defendant's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), and (6). The plaintiff, Sandra Jean Simpson, seeks compensatory and punitive damages under the Antiterrorism and Effective Death Penalty Act of 1996 ("Antiterrorism Act"). Ms. Simpson claims that she and her late husband were taken hostage and tortured by the Socialist People's Libyan Arab Jamahiriya ("Libya" or "the defendant").

The defendant seeks dismissal of the plaintiff's complaint on the following grounds: first, the plaintiff has failed to afford Libya a reasonable opportunity to arbitrate the plaintiff's claims; second, the Antiterrorism Act, which purportedly gives this court jurisdiction over the plaintiff's complaint, violates general principles of international and constitutional law; and third, the plaintiff fails to state a claim on which relief can be granted. Alternatively, the defendant asks the court to stay the present action so that Libya has an opportunity to arbitrate the plaintiff's claims. For the reasons that follow, the court will deny the defendant's motion.

### II. BACKGROUND

In February 1987, Ms. Simpson and her late husband were enjoying a voyage aboard the Carin II, a ship cruising the Mediterranean Sea from Italy to Greece. *See* Compl. at 2–3. On February 7, 1987, a severe storm interrupted the cruise. *See id.* at 3. In its two-day battle with the storm, the Carin II lost its main engine and most of its fuel. *See id.* The Carin II sought assistance from Japanese, Russian, and Libyan freighters, but to no avail. *See id.*

Later, on February 10, 1987, Libyan harbor authorities in Benghazi, Libya received distress signals from the Carin II. *See id.* The Libyans notified the Carin II that it could use the Port of Benghazi as a "safe harbor," and a Libyan harbor pilot boat subsequently escorted the Carin II to a mooring in the harbor. *See id.*

Although the plaintiff and other passengers aboard the Carin II notified the Libyans that they intended to continue their voyage once the storm abated, on February 14, 1987, the Libyans boarded the Carin II and "forcibly removed" the passengers and crew. *See id.* According to the plaintiff, the Libyans held the plaintiff and her husband captive and threatened them with death if they attempted to leave. *See id.* Nearly three months into Ms. Simpson's captivity, the Libyans separated her from her husband. *See id.* The Libyans released Ms. Simpson on May 12, 1987, but held her husband incommunicado for four more months, during which the plaintiff was unable to learn of her husband's condition or whereabouts. *See id.*

The plaintiff filed a complaint *pro se* on July 21, 2000 against Libya, pleading battery, false imprisonment, intentional infliction of emotional distress, loss of consortium, and punitive damages. *See id.* at 4–6. On November 9, 2000, the plaintiff filed an affidavit indicating that she was unable to serve the summons and complaint. On November 14, 2000, the plaintiff asked the clerk of the court to serve a perfected complaint. On March 27, 2001, Libya filed a return of service affidavit indicating that the complaint had been executed on January 25, 2001. On March 27, 2001, the plaintiff moved for entry of default, which the court granted two days later. The plaintiff, still *pro se*, mailed her offer to arbitrate to Libya on April 19, 2001. *See* Pl.'s Opp'n Ex. D. Libya received the offer five days later, on April 24, 2001. *See id.* Having received the plaintiff's offer, Libya filed an entry of appearance and a motion to reopen the case and extend time to file an answer. The court granted Libya's motion on June 15, 2001, and on July 23, 2001, Libya filed the instant motion. On August 6, 2001, an attorney filed an appearance on behalf of the plaintiff and filed an opposition to the motion to dismiss.

## III. ANALYSIS

### A. Legal Standard for Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6)

On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction. *See District of Columbia Retirement Bd. v. United States,* 657 F.Supp. 428, 431 (D.D.C.1987). In evaluating whether subject-matter jurisdiction exists, the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overturned on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations. *See, e.g., Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir.1990).

Moreover, the court need not limit itself to the allegations of the complaint. *See Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds by* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Rather, the court may consider such materials outside the pleadings as it deems appropriate to determine whether it has jurisdiction in the case. *See Herbert v. National Academy of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992).

For a complaint to survive a Rule 12(b)(6) motion to dismiss, it need only provide a short and plain statement of the claim and the grounds on which it rests. *See* FED.R.CIV.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A motion to dismiss under Rule 12(b)(6) tests not whether the plaintiff will prevail on the merits, but instead whether

the plaintiff has properly stated a claim. *See* FED.R.CIV.P. 12(b)(6); *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. The plaintiff need not plead the elements of a prima-facie case in the complaint. *See Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1114 (D.C.Cir.2000). Thus, the court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Atchinson v. District of Columbia,* 73 F.3d 418, 422 (D.C.Cir.1996). Moreover, the court should draw all reasonable inferences in the nonmovant's favor. *See Judicial Watch, Inc. v. Clinton,* 880 F.Supp. 1, 7 (D.D.C.1995).

## B. This Court Has Subject–Matter Jurisdiction Over the Plaintiff's Complaint

The defendant's challenges to this court's subject-matter jurisdiction fall into two categories: first, the defendant claims that the plaintiff's offer to arbitrate does not satisfy the jurisdictional requirements of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), as amended, 28 U.S.C. §§ 1602–1611, *see* Mot. to Dismiss at 6; second, the defendant claims that provisions in the FSIA that provide for subject-matter jurisdiction over foreign nations for terrorist acts are unconstitutional as applied to Libya, *see* Mot. to Dismiss at 15, 23, 25, 31. As discussed more fully below, the court rejects Libya's arguments and holds that subject-matter jurisdiction exists in this case.

### 1. Offer to Arbitrate

 The FSIA generally entitles foreign states to immunity from civil liability in United States courts. *See* 28 U.S.C. § 1602. Under the FSIA, "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). In 1996, Congress created one such exception by passing the Antiterrorism and Effective Death Penalty Act of 1996. *See* 28 U.S.C. § 1605. The Act lifts the immunity of certain foreign states from lawsuits over injury or death to American nationals resulting from state-sponsored terrorist acts such as "torture, extrajudicial killing, aircraft sabotage, [or] hostage taking." *See* 28 U.S.C. § 1605(a)(7); *see also Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 12 (D.D.C.1998) (describing amendments to FSIA). Through an amendment to the Act known as *Civil Liability for Acts of State Sponsored Terrorism* or the "Flatow Amendment," the Act also provides a cause of action for the aforementioned terrorist acts. *See Flatow,* 999 F.Supp. at 12–13.

For a United States court to have subject-matter jurisdiction pursuant to the Antiterrorism Act, the claimant must generally demonstrate:

(1) that personal injury or death resulted from an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking; and

(2) the act was either perpetrated by the foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant; and

(3) the act or the provision of material support or resources is engaged in by an agent, official or employee of the foreign state while acting within the scope of his or her office, agency or employment; and

(4) that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act; and

(5) if the incident complained of occurred with [sic] the foreign state defendant's territory, plaintiff has offered the defendants a *reasonable opportunity to arbitrate the matter;* and

(6) either the plaintiff or the victim was a United States national at the time of the incident; and

(7) similar conduct by United States agents, officials, or employees within the United States would be actionable.

*Flatow,* 999 F.Supp. at 16 (emphasis added) (citing 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note).

Libya, a country that the Department of State has designated as a "terrorist state," *see* 22 C.F.R. § 126.1(d) (2001), challenges the plaintiff's complaint under the fifth element listed above. Specifically, Libya argues that (i) the plaintiff did not "make an offer to arbitrate [her claim] either *prior to* or *concurrent with* the filing of her complaint," and (ii) when the plaintiff finally offered to arbitrate her claim, her "untimely" offer was "not reasonable." *See* Mot. to Dismiss at 6 (emphasis added). Libya claims that these failures deprive this court of subject-matter jurisdiction. *See id.* The court disagrees.

### i. Timing

■ The Antiterrorism Act explicitly requires the claimant to give the "foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration." *See* 28 U.S.C. § 1605(a)(7)(B)(i). While Libya reads this language to indicate that extending an offer to arbitrate is a "condition *precedent* to the filing of a complaint," *see* Mot. to Dismiss at 6 (emphasis added), the plaintiff maintains that she can satisfy the arbitration requirement at any point subsequent to filing her complaint and reasonably prior to the defendant's motion to dismiss. *See* Pl.'s Opp'n at 4.

Libya fails to provide any case law to support its argument that a claimant must make the offer to arbitrate prior to or concurrent with the filing of a complaint. Although Libya cites *Daliberti v. Republic of Iraq,* 97 F.Supp.2d 38 (D.D.C.2000), as an example of an offer to arbitrate that was filed contemporaneously with a complaint, in *Daliberti* the court explicitly noted that the offer to arbitrate was not in question. *See id.* at 44 n. 4. Additionally, the language of the Antiterrorism Act makes no mention of the precise timing of the offer. *See* 28 U.S.C. § 1605(a)(7)(B)(i). The Act merely states that, for immunity to be lifted, the offer must be made. *See id.* Accordingly, the proper question for this court to address regarding the timing of the plaintiff's offer is not whether the plaintiff offered to arbitrate prior to or concurrent with the filing of her complaint, but whether the plaintiff has afforded the defendant a *reasonable* opportunity to arbitrate.

A review of the procedural history of this case indicates that the plaintiff afforded Libya a reasonable opportunity to arbitrate her claim. The plaintiff filed her complaint *pro se* on July 21, 2000, but had difficulty with serving Libya. On March 27, 2001, Libya filed a return of service affidavit indicating that the complaint was executed on January 25, 2001. The plaintiff, still *pro se,* mailed her offer to arbitrate to Libya on April 19, 2001. *See* Pl.'s Opp'n Ex. D. Libya received the offer five days later, on April 24, 2001, almost two months before they filed the instant motion to dismiss instead of an answer. *See id.* Thus, from late April 2001 to the present, Libya has had the opportunity to contemplate and respond to the plaintiff's proposal for arbitration. Libya has not responded to the plaintiff's offer, however, and this court will not postpone the adjudication of this case indefinitely. Accordingly, the court holds that, with regard to the

defendant's timing argument, the plaintiff has afforded the defendant a reasonable opportunity to arbitrate under 28 U.S.C. § 1605(a)(7)(B)(i).

### ii. Reasonableness

■ The defendant further attacks the plaintiff's offer to arbitrate by claiming that her offer made the "unreasonable" demand that the arbitration process permit the plaintiff to remain in the United States. *See* Mot. to Dismiss at 6. Libya argues that, "because officials of the Libyan government are not currently permitted in the United States, and therefore could not be present to participate in an arbitration in this country, the offer on its face is unreasonable." *Id.* The plaintiff, on the other hand, maintains that her offer was "very reasonable and designed to provide notice and evoke a response from a party willing to engage in . . . arbitration." Pl.'s Opp'n at 5. Specifically, the plaintiff observes that arbitration agents can negotiate for principles, travel, and communicate with other parties or agents by the phone. *See id.*

The court determines that the plaintiff has established subject-matter jurisdiction. The Antiterrorism Act requires the claimant to afford the defendant a reasonable chance to arbitrate "in accordance with accepted international rules of arbitration." 28 U.S.C. 1605(a)(7)(B)(i). In her arbitration offer, the plaintiff required that "[t]he arbitration . . . be conducted by a third-party organization with extensive experience in arbitrating international disputes." Pl.'s Opp'n Ex. D. Although the plaintiff insisted that "[t]he arbitration process will not require my absence from

the United States," the plaintiff made no demand that Libyan officials would have to enter the United States—or, indeed, leave their own county. Moreover, it is reasonable to infer from the plaintiff's request for an experienced international arbitrator that the plaintiff planned to proceed "in accordance with accepted international rules of arbitration." 28 U.S.C. 1605(a)(7)(B)(i); *see also Pitney Bowes, Inc. v. U.S. Postal Service*, 27 F.Supp.2d 15, 19 (D.D.C.1998) (when considering subject-matter jurisdiction, a court must make all reasonable inferences in the plaintiff's favor). The court must infer that such would be the behavior of an experienced international arbitrator. The court therefore determines that the plaintiff's request for arbitration meets the jurisdictional requirements of 28 U.S.C. 1605(a)(7)(B)(i).[1]

### 2. The Antiterrorism Act

The defendant challenges the Antiterrorism Act on the following grounds: (1) the Act relies on a theory of jurisdiction that is "not sanctioned by international law and practice," Mot. to Dismiss at 15; (2) "congress lacked constitutional authority to enact the [Act]," *id.* at 23; (3) the Act "violates the separation of powers doctrine because it transforms the courts into mere foreign policy tools of the executive branch," *id.* at 25; and (4) the Act violates Libya's right to equal protection, *id.* at 31. As discussed below, recent cases from this district have rejected virtually identical arguments. *See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya*, 110 F.Supp.2d 10, 12–16 (D.D.C.2000); *Daliberti*, 97 F.Supp.2d at 48–55; *Flatow*, 999 F.Supp. at 10–27;[2] *see also Rein v. Social-*

---

1. This holding does not preclude Libya's request for a stay to facilitate arbitration: if it wishes and can do so in good faith, Libya can present this court with evidence as to why it has delayed responding to the plaintiff's offer, any compromises it has attempted to reach

with the plaintiff regarding her geographical requirements, and why this court should stay the case until Libya communicates with the plaintiff about her offer.

2. While this court is not bound to follow other trial courts from within this district, cases

*ist Libyan Arab Jamahiriya,* 162 F.3d 748, 764 (2nd Cir.1998) (finding that the Antiterrorism Act is not an unconstitutional delegation of Congressional power). This court, too, rejects the above arguments.

### i. International Law

Addressing a very similar argument regarding jurisdiction and international law, the *Price* court dismissed the defendant's international-law argument by properly observing that the court was bound by an earlier ruling on a similar issue by the D.C. Circuit: "The statute in question reflects an unmistakable congressional intent, consistent with treaty obligations of the United States, to authorize prosecution of those who take Americans hostage abroad no matter where the offense occurs or where the offender is found. Our inquiry can go no further." *Price,* 110 F.Supp.2d at 13 (quoting *United States v. Yunis,* 924 F.2d 1086 at 1091 (D.C.Cir.1991)). Although *Yunis* stated that courts should afford international law greater deference when congressional intent or the language of a statute is ambiguous, 924 F.2d at 1091, this court finds no vagueness in the Antiterrorism Act. The Act unambiguously lifts sovereign immunity and provides a cause of action to American nationals harmed by the acts of terrorist states. *See generally* 28 U.S.C. § 1605. Accordingly, the court rejects Libya's international-law argument that the court lacks jurisdiction.

### ii. Congressional Authority

Libya argues that, although Congress is a legislature of specific and enumerated powers, "[n]one of the constitutional sources that Congress relied upon in enacting the original FSIA authorized the

from such courts are highly persuasive precedent. *See, e.g., United States v. Drummond,*

enactment of the [Antiterrorism Act]." Mot. to Dismiss at 23. The defendant in *Price* made an identical argument, and the court held that "the Constitution grants Congress the power to create subject-matter jurisdiction for federal courts through the FSIA." *Price,* 110 F.Supp.2d at 13. In reaching this holding, *Price* relied on *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), in which the Supreme Court stated that "foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Verlinden* further stated that, "[b]y reason of its authority over foreign commerce and foreign relations, Congress has the undisputed power to decide, as a matter of federal law, whether and under what circumstances foreign nations should be amenable to suit in the United States." *Id.* at 492, 103 S.Ct. 1962. Following *Verlinden* and recognizing Congress' power to determine when and how foreign nations are amenable to suit in this country, the court rejects Libya's congressional-authority argument.

### iii. Separation of Powers

Libya contends that the Antiterrorism Act unconstitutionally delegates to an executive branch official "exclusive power to declare when and under what circumstance federal courts may entertain suits against foreign states." *See* Mot. to Dismiss at 28. The *Price* defendant made an identical argument. *See Price,* 110 F.Supp.2d at 13 ("Defendant argues that the [Antiterrorism Act is] an unconstitutional delegation of legislative powers to the executive branch since [it] authorize[s] the Secretary of State to determine which

98 F.Supp.2d 44, 50 n. 5 (D.D.C.2000).

foreign countries are amenable to suit in the United States under § 1605(a)(7).").
Relying on the Second Circuit's holding in *Rein,* however, *Price* rejected the defendant's argument, stating that "the decision to subject Libya to the jurisdiction of American courts was made by Congress and not the executive branch." *See Price,* 110 F.Supp.2d at 13–14. According to *Rein,*

> The decision to subject Libya to jurisdiction under § 1605(a)(7) was manifestly made by Congress itself rather than by the State Department. At the time that § 1605(a)(7) was passed, Libya was already on the list of state sponsors of terrorism. No decision whatsoever of the Secretary of State was needed to create jurisdiction over Libya for its alleged role in the destruction of Pan Am 103. That jurisdiction existed the moment that the [Antiterrorism Act] became law.

*Rein,* 162 F.3d at 764. This court agrees with the holdings in *Rein* and *Price.* Although the Antiterrorism Act defines the term "terrorist states" by reference to a determination made by the State Department, *see* 28 U.S.C. § 1605(a)(7), the Supreme Court has long recognized the constitutionality of this form of "delegation." *See Yakus v. United States,* 321 U.S. 414, 424–25, 64 S.Ct. 660, 88 L.Ed. 834 (1944) ("[The Constitution] does not require that Congress find for itself every fact upon which it desires to base legislative action . . . ."). Thus, Congress, not the State Department, made the decision that ultimately subjected Libya to jurisdiction, and the defendant's separation of powers argument therefore fails. *See Daliberti,* 97 F.Supp.2d at 49 (separation of powers not violated).

### iv. Equal Protection

■ Libya argues that the Antiterrorism Act is not "rationally related to a legitimate, articulated governmental function" and thus violates Libya's right to equal protection. *See* Mot. to Dismiss at 31. Libya has identified the proper level of scrutiny for such classifications. Accordingly, "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Under this rational-basis analysis, where there are plausible reasons for Congress' action, the court's inquiry is "at an end." *See id.* at 313–14, 113 S.Ct. 2096. Thus, a strong presumption of constitutionality attaches to classifications such as the one in question, and the party attacking the classification has the burden of negating "every conceivable basis which might support it." *See id.* at 315, 113 S.Ct. 2096; *see also Rein v. Socialist People's Libyan Arab Jamahiriya,* 995 F.Supp. 325, 331 (E.D.N.Y.1998) (applying a rational-basis test to the defendant's challenge of the Antiterrorism Act on equal-protection grounds), *aff'd in part, dismissed in part,* 162 F.3d 748.

It should be noted that, because the Fifth Amendment gives no indication that its protections apply to nations, *see* U.S. Const. amend. V, it is unclear if Libya has standing to assert an equal protection challenge. This district has addressed this issue, noting the ambiguity and then proceeding with the appropriate constitutional analysis. *See, e.g., Daliberti,* 97 F.Supp.2d at 50 ("Indulging the same assumptions as have other courts that a foreign sovereign may enjoy at least certain constitutional protections, the Court will address Iraq's constitutional challenges on their merits."). This court follows the rule set forth in

*Daliberti* by addressing the merits of Libya's equal protection argument.

Libya fails to meet the burden under the rational-basis test. Libya claims that the Antiterrorism Act is irrational because, "from the plaintiff's point of view, it is of no moment that the alleged torturer was a Saudi Arabian jail guard ... or a Libyan jail guard." Mot. to Dismiss at 32. This argument is unclear and unpersuasive. As stated in *Daliberti,*

> the intent of Congress [in passing the Antiterrorism Act] is abundantly clear. Concerned with acts of terrorism perpetrated against United States citizens abroad, Congress sought to provide a method whereby victims of such acts could seek redress in United States courts.... The nations that Congress singled out are those that consistently operate outside the bounds of the international community by sponsoring and encouraging acts generally condemned by civilized nations.... *The distinction made by Congress between those states that have been designated as sponsors of terrorism and those that have not is rationally related to its purpose of protecting U.S. citizens by deterring international terrorism and providing compensation for victims of terrorist acts.*

97 F.Supp.2d at 52. As in *Daliberti,* this court believes that Congress had a "plausible basis" for passing the Antiterrorism Act. *See id.* The court's analysis is therefore "at an end." Accordingly, the court holds that the Antiterrorism Act is constitutional as applied to Libya.

### C. Personal Jurisdiction

■ The defendant claims that this court's exercise of personal jurisdiction over Libya violates the Due Process Clause of the Fifth Amendment. *See* Mot. to Dismiss at 32–33. The defendant grounds its claim on an argument that "any assertion of personal jurisdiction over a foreign state must be informed by the due process principles of *International Shoe.*" *See id.* (referring to *International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Other courts in this jurisdiction have addressed arguments identical to the defendant's and have concluded that the *Shoe* standard is not applicable to the Antiterrorism Act. *See, e.g., Daliberti,* 97 F.Supp.2d at 53; *Price,* 110 F.Supp.2d at 14.

Under the FSIA, personal jurisdiction over defendants exists when the plaintiff (a) establishes an exception to the defendant's immunity under 28 U.S.C. §§ 1604, 1605, or 1606, and (b) accomplishes service of process pursuant to 28 U.S.C. § 1608. *See* 28 U.S.C. 1330(b); *Verlinden,* 461 U.S. at 485 n. 5, 103 S.Ct. 1962; *Rein,* 162 F.3d at 759. Thus, as explained in *Flatow,* "an inquiry into personal jurisdiction over a foreign state need not consider the rubric of 'minimum contacts'; *the concept of 'minimum contacts' is inherently subsumed within the exceptions to immunity defined by the statute.*" 999 F.Supp. at 20 (emphasis added). In the present case, then, the court need not address the defendant's minimum contacts analysis. The plaintiff has established an exception to Libya's immunity under 28 U.S.C. § 1605, and the adequacy of her service of process is not in dispute. Accordingly, the court rejects the defendant's personal jurisdiction argument and holds that the plaintiff has satisfied the personal-jurisdiction requirements of 28 U.S.C. § 1330(b).

### D. The Plaintiff's Complaint Does State Claims on Which Relief Could be Granted

■ Libya claims that the plaintiff fails to allege sufficiently a cause of action for torture or hostage taking. Federal Rule of Civil Procedure 8(a)(2) requires that the

complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." As stated herein, a court will dismiss a claim under Rule 12(b)(6) only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the claimant's allegations.

### 1. Torture

For purposes of the Antiterrorism Act, the definition of "torture" is derived from section 3 of the Torture Victim Protection Act of 1991, which states:

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
>
> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—
>
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act of 1991, Pub.L. No. 102–256, § 3, 106 Stat. 73 (1992); *see also* 28 U.S.C. § 1605(e)(1). In her complaint, the plaintiff alleges that she was "interrogated and then held incommunicado," "threatened with death by representatives of the defendant if [she] moved from the quarters where [she was] held," and "forcibly separated from her husband ... [and unable] to learn of his welfare or his whereabouts...." Compl. at 3–4. Considering the above definition of torture and the requirements of Rule 8, the court determines that the plaintiff has stated a claim for torture on which relief could be granted.

### 2. Hostage Taking

For purposes of the Antiterrorism Act, the term "hostage taking" is derived from Article 1 of the International Convention Against the Taking of Hostages, which defines hostage taking as:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party, namely, a State, an international governmental organization, a natural or juridical person or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking hostages within the meaning of this Convention.

Article I, International Convention Against the Taking of Hostages, U.N. GAOR, Supp. No. 39, at 23, U.N. Doc. A/34/39 (1979); *see also* 28 U.S.C. § 1605(e)(2). In the present case, the plaintiff has alleged that Libya held her captive and incommunicado for several months, threatening the plaintiff with death if she attempted to

leave her area of confinement. *See* Compl. at 4. The plaintiff has not elaborated on Libya's intentions in detaining her—for example, whether the Libyans sought to compel action from some party as a result of the alleged hostage taking. As stated above, however, in ruling on a Rule 12(b)(6) motion, the court should draw all reasonable inferences in the nonmovant's favor, and the court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon*, 467 U.S. at 73, 104 S.Ct. 2229; *Judicial Watch, Inc.*, 880 F.Supp. at 7. Although it is difficult to understand the reasons for Libya's behavior (as described in this case), the court believes that it is reasonable to infer that Libya sought to compel some third-party action or inaction as a result of Ms. Simpson's seizure and detention. Under the above definition of hostage taking and the requirements of Rules 8 and 12, the court therefore concludes that the plaintiff has stated a claim for hostage taking.

## IV. CONCLUSION

For all these reasons, the court denies the defendant's motion to dismiss. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously issued this 31 day of October, 2001.