Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued November 19, 2002      Decided April 22, 2003

No. 01-7191

SANDRA JEAN SIMPSON,
APPELLEE

v.

SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA,
APPELLANT

————

Appeal from the United States District Court
for the District of Columbia
(No. 00cv01722)

————

*Arman Dabiri* argued the cause and filed the briefs for appellant.

*Eric C. Sorenson* argued the cause and filed the brief for appellee.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* SENTELLE.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

SENTELLE, *Circuit Judge*: Sandra Jean Simpson ("appellee" or "Simpson") sued the Socialist People's Libyan Arab Jamahiriya ("appellant" or "Libya") alleging claims for hostage taking and torture. After entering default judgment in favor of appellee, the District Court, on motion of appellant, reopened the case and permitted Libya to file motions to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim for relief. The court denied the motions to dismiss. Libya brought the instant interlocutory appeal under the collateral order doctrine. For the reasons more fully set out below, we reverse as to the torture claim and remand for dismissal; as to the hostage-taking claim, we vacate and remand to permit Simpson to attempt to cure the deficiency of her complaint by amendment.

## I

Simpson's complaint alleges the following facts: On February 7, 1987, Simpson, a United States citizen, and her husband, then a permanent resident of the United States, were passengers on the Carin II, a cruise ship, cruising through the Mediterranean, when a severe storm interrupted the cruise. The Carin II was seriously damaged in the storm. On February 10, 1987, Libyan harbor authorities in Benghazi, Libya notified the Carin II that it could use the Port of Benghazi as a safe harbor. Subsequently, a Libyan harbor boat escorted the Carin II into port.

On February 14, 1987, Libyan authorities boarded the Carin II and "forcibly removed" the passengers and crew. Libya held Simpson and her husband captive and threatened to kill them if they tried to leave. Libyan authorities separated Simpson from her husband approximately three months into their captivity. Shortly thereafter, Libya released Simpson but held her husband incommunicado for four more months.

On July 21, 2000, Simpson filed a *pro se* complaint against Libya, alleging battery, false imprisonment, intentional infliction of emotional distress, loss of consortium, and seeking

compensatory and punitive damages. Following some difficulty in serving the summons and complaint, service was effected on or about January 25, 2001. On March 27, 2001, Simpson moved for entry of default, which the District Court granted two days later. On April 19, 2001, Simpson mailed to Libya an offer to arbitrate. Simpson's offer to arbitrate was made subject to certain conditions. Among the conditions were that the arbitration would be conducted "by a third-party organization with extensive experience in arbitrating international disputes" and that the arbitration would "not require [Simpson's] absence from the United States." Offer to Arbitrate ¶¶ 1, 2. After receiving Simpson's offer to arbitrate, Libya filed an entry of appearance and a motion to reopen the case and extend time to file an answer. The District Court granted this motion on June 15, 2001. On July 23, 2001, Libya filed a motion to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. The District Court denied the motion. *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 180 F. Supp. 2d 78 (D.D.C. 2001). Libya now appeals from the denial of its motion.

## II

The Foreign Sovereign Immunities Act ("FSIA") entitles foreign states to immunity from civil suits in United States courts, with specific exceptions. The Antiterrorism and Effective Death Penalty Act amended the FSIA by adding what is now 28 U.S.C. § 1605(a)(7), creating a new exception. Under section 1605(a)(7), foreign states that, like Libya, have been designated as state sponsors of terrorism are denied immunity for damages actions for personal injury or death resulting from certain acts, including acts of "torture" and "hostage taking." 28 U.S.C. § 1605(a)(7). The Flatow Amendment to the FSIA creates a right of action for torture or hostage taking against an "official, employee, or agent of a foreign state." Pub. L. No. 104–208, Div. A, Title I, § 101(c), 110 Stat. 3009–172 (1996) (codified at 28 U.S.C. § 1605 note).[1]

---

[1] As we acknowledged recently in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002), the

Section 1605(a)(7) contains as a jurisdictional requirement that "the claimant . . . afford[ ] the foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration" if "the act occurred in the foreign state against which the claim has been brought."  28 U.S.C. § 1605(a)(7)(B)(i).  Libya contends that the case should be dismissed for lack of jurisdiction because Simpson's offer to arbitrate was neither timely nor reasonable under 28 U.S.C. § 1605(a)(7).

With regard to the timeliness of the offer to arbitrate, Libya argues that because this is a jurisdictional matter, we should require that the offer to arbitrate be made prior to (or at least concurrent with) the filing of the complaint.  However, section 1605(a)(7) sets no rule requiring that the offer to arbitrate be made before the filing of the complaint.  It merely requires that the offer be made by such time as to allow Libya a "reasonable opportunity" to arbitrate.  28 U.S.C. § 1605(a)(7)(B)(i).  In this instance, Simpson transmitted her offer to arbitrate to Libya in April of 2001.  Libya received the offer almost two months before responding to Simpson's complaint with the motion to dismiss presently under review.  *Simpson*, 180 F. Supp. 2d at 83.  We cannot say that the timing of the offer is such that Simpson has not afforded Libya a "reasonable opportunity" to arbitrate.  This is especially true given that a plaintiff may amend a complaint to remedy a jurisdictional defect even as late as the appellate stage of proceedings.  28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended . . . in the trial or appellate courts.").  Thus, it is difficult to see how an offer of arbitration two months before a foreign sovereign responds to a complaint against it in any fashion can be factually prejudicial, or legally insufficient, given that the plaintiff may amend

Flatow Amendment does not list "foreign states" among the parties against whom an action may be brought.  Libya, recognizing this, argues that Simpson's complaint should be dismissed because the Flatow Amendment does not create a federal cause of action against foreign states.  However, Libya concedes that it failed to raise this issue in the District Court, so we do not pass on this issue here.

to cure jurisdictional defects even at later times, and there is no claim that the allegation of the offer is untrue.

Libya further argues that the offer to arbitrate was not reasonable because it requires that the arbitration take place in the United States. Libya's argument fails because it misstates the conditions Simpson attached to her offer to arbitrate. The offer simply stated that the arbitration "not require [Simpson's] absence from the United States." Offer to Arbitrate ¶ 2. This is not synonymous with requiring that the arbitration be conducted in the United States. With modern means of electronic communication, there is no impediment to conducting arbitrations with one party in the United States and the other in Libya. Furthermore, arbitrations may be conducted through attorneys or agents, so that even if all proceedings were conducted in Libya or some neutral site, there is no reason why Simpson would be required to be absent from the United States. The FSIA, as amended, does not require any particular form of offer to arbitrate, simply the extension of a "reasonable opportunity." The form of Simpson's offer to arbitrate did not prevent it from affording Libya a reasonable opportunity to arbitrate.

As Simpson's complaint survives the jurisdictional challenge, we next consider the sufficiency of the complaint to state claims for relief for torture and hostage taking against Libya. The term "torture," as used in the amended FSIA, derives its meaning from section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note ("TVPA"), which borrows from the 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. GAOR, 39th Sess. Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984) ("Torture Convention"). As we held in *Price*, 294 F.3d at 91–93, that definition of torture includes a "severity requirement" that is "crucial to ensuring that the conduct proscribed by the Convention and the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Id.* at 92. "[T]orture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." *Id.* at 93.

Rather, torture is a label that is "usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." *Id.* at 92–93 (quoting S. Exec. Rep. No. 101–30, at 14 (1990)).

Simpson alleges here that she was "interrogated and then held incommunicado," "threatened with death . . . if [she] moved from the quarters [where she was] held," and "forcibly separated from her husband . . . [and unable] to learn of his welfare or his whereabouts." Although these alleged acts certainly reflect a bent toward cruelty on the part of their perpetrators, they are not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the Act. Accordingly, we reverse the District Court's order as to Simpson's claim for torture.

Section 1605(e)(2) defines "hostage taking" as that term is used in Article 1 of the International Convention Against the Taking of Hostages ("ICATH"). "Hostage taking" occurs under the ICATH (and so under the FSIA) when a person "seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of a hostage." Article I, ICATH, U.N. GAOR, Supp. No. 39, U.N. Doc. A/34/39 (1979). The essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the convention. *Price*, 294 F.3d at 94.

In her complaint, Simpson alleges that she was held captive and incommunicado for several months, but she does not allege that Libya's intended purpose behind her detention was to compel anyone to do or abstain from doing any act. Although the District Court thought it "reasonable to infer that Libya sought to compel some third-party action or inaction" by detaining Simpson, 180 F. Supp. 2d at 89, we think it clear that Simpson's complaint fails to state a hostage-taking claim because it does not articulate any in-

tended purpose behind her detention, and certainly not one of the sort described in the convention and discussed by this court in *Price*. Nevertheless, we, as in *Price*, find it possible that Simpson might be able to allege facts supporting the proposition that Libya intended to compel action or inaction by a third party "as an explicit or implicit condition" of Simpson's release. So, with respect to Simpson's hostage-taking claim, we vacate and remand to the District Court to allow Simpson to attempt to amend her complaint in an effort to satisfy the definition of hostage taking as used in the FSIA and the ICATH.

## CONCLUSION

As Simpson's offer to arbitrate afforded Libya a reasonable opportunity to arbitrate Simpson's claim, there is no jurisdictional flaw barring Simpson's complaint, and we affirm the District Court with respect to this issue. Nevertheless, Simpson fails to state a claim for torture as that term is used in the FSIA and the TVPA, and we reverse as to that claim. Simpson likewise fails to state a claim for hostage taking as that term is used in the FSIA and the ICATH. Because it appears possible that Simpson might be able to allege facts supporting a claim that Libya intended to compel action or inaction by a third party as a condition of Simpson's release, we vacate the District Court's decision with respect to the hostage-taking claim and remand to allow Simpson an opportunity to amend her complaint.

*So ordered.*