**Sandra Jean SIMPSON, and Alexander J. Simpson, Personal Representative for the Estate of Dr. Mostafa Karim, Plaintiffs,**

v.

**The SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, Defendant.**

No. CIV.A. 00–1722(RMU).

United States District Court, District of Columbia.

March 7, 2005.

Eric Christopher Sorenson, New York City, for Plaintiffs.

Arman Dabiri Abkenari, Tarrant Hale Lomax, Washington, DC, for Defendant.

## MEMORANDUM OPINION

URBINA, District Judge.

### DENYING THE DEFENDANT'S MOTION TO DISMISS; GRANTING THE PLAINTIFFS LEAVE TO AMEND

## I. INTRODUCTION

This matter comes before the court on the defendant's motion to dismiss the plaintiffs' amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). Sandra Jean Simpson and the estate of her deceased husband, Mostafa Karim,[1] (together, the "plaintiffs") bring suit under international law, the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and state common law, seeking compensatory damages for an act of hostage taking that the defendant, the Socialist People's Libyan Arab Jamahiriya ("Libya"), allegedly committed in 1987. Libya seeks dismissal for lack of personal and subject-matter jurisdiction, failure to state a claim, and on the grounds that the amended complaint violates the "mandate rule." For the reasons that follow, the court denies the defendant's motion.

## II. BACKGROUND

### A. Factual Background

The plaintiffs' amended complaint alleges the following facts: in February 1987, the plaintiffs were aboard the *Carin II*, cruising through the Mediterranean, when

---

1. Sandra Simpson is a United States citizen. Am. Compl. ¶ 1. Mostafa Fahmy Karim was born in Cairo and became a permanent resident of the United States in 1964. *Id.* ¶ 2. In 1993, shortly before his death, he became a United States citizen. *Id.*

an unexpected storm forced the boat to send a radio distress signal. Am. Compl. ¶¶ 1, 16–18. Libyan harbor authorities responded to the signal on February 10, 1987, notifying the boat that it could enter the port of Benghazi as a safe harbor. *Id.* ¶ 18. On February 14, 1987, while the boat was still in the port of Benghazi, Libyan authorities boarded the boat, "forcibly removed" all passengers, and detained them in the *Uzo Hotel*, prohibiting them from leaving or placing telephone calls. *Id.* ¶ 25.

The plaintiffs remained in the *Uzo Hotel* against their will until March 1, 1987, when unidentified officials took them by van some four hours away to a hotel in the Green Mountains of eastern Libya. *Id.* ¶ 28. The plaintiffs were not allowed out of their new location for twenty-six consecutive days, and they were informed that they would be shot if they attempted to leave or if an order to shoot them was given. *Id.* ¶¶ 33, 35. During this period, the Government of Belgium, the "Protecting Power" for American interests in Libya, made three separate demands for information from Libya regarding the plaintiffs, but Libya did not respond. *Id.* ¶ 36.

The plaintiffs remained against their will in the Green Mountains until May 13, 1987, at which time they were flown to Tripoli. *Id.* ¶ 37. In Tripoli, Ms. Simpson was forcibly separated from her husband and allowed to fly to Zurich, but her husband was detained for the next seven months in solitary confinement. *Id.* ¶ 38. As the plaintiffs state, "during the entire period of forced detainment in Libya neither the plaintiffs, nor any member of the *Carin* Party were informed by their captors of the reason for their detention[.]" *Id.* ¶ 62.

## B. Procedural History

Sandra Jean Simpson filed her original complaint *pro se* on July 21, 2000, alleging torture, hostage-taking, battery, false imprisonment, intentional infliction of emotional distress, and loss of consortium, and seeking compensatory and punitive damages. *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 180 F.Supp.2d 78, 81 (D.D.C.2001) ("*Simpson I*"). On March 27, 2001, the plaintiff moved for entry of default, which the Clerk of the Court entered two days later. *Id.* On April 19, 2001, the plaintiff mailed Libya an offer to arbitrate. *Id.* After receiving the plaintiff's offer, Libya filed an entry of appearance and a motion to reopen the case and extend time to file an answer. *Id.* The court granted Libya's motion, and on July 23, 2001, Libya filed a motion to dismiss for lack of subject-matter jurisdiction, lack of personal jurisdiction, and failure to state a claim for hostage taking or torture. *Id.* The court denied Libya's motion in full, holding that the court had subject-matter and personal jurisdiction and that the plaintiff stated claims for torture and hostage taking. *Id.* at 80–81.

The defendant sought interlocutory appeal, and on appeal the D.C. Circuit affirmed this court's jurisdictional holding, reversed and remanded for dismissal of the torture claim, and vacated and remanded on the hostage-taking claim, allowing the plaintiff to amend her complaint with regard to the hostage-taking claim. *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 235 (D.C.Cir. 2003) ("*Simpson II*"). After remand, the plaintiff filed an amended complaint, the defendant filed a motion to dismiss (to which the plaintiff and defendant filed an opposition and reply, respectively), and this court set a schedule for jurisdictional discovery—specifically, for the parties to provide further information on hostage taking. That discovery period is now complete, the court has received the parties' submissions on hostage-taking, and the

court is ready to proceed to the merits of the defendant's motion to dismiss.

## III. ANALYSIS

### A. Subject–Matter Jurisdiction

#### 1. Legal Standard for a Rule 12(b)(1) Motion to Dismiss Under the FSIA

The Foreign Sovereign Immunities Act ("FSIA") is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The basic premise of the FSIA is that foreign sovereigns are immune from suit in the United States unless the action falls under one of the specific exceptions enumerated in the statute. 28 U.S.C. § 1604; *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 196 (D.C.Cir. 2004) (*"Price II"*). If the foreign sovereign is not immune, the federal district courts have exclusive jurisdiction over the action. 28 U.S.C. §§ 1330, 1604; *Daliberti v. Republic of Iraq*, 97 F.Supp.2d 38, 42 (D.D.C.2000) (citing *Amerada Hess*, 488 U.S. at 434–35, 109 S.Ct. 683).

Under the FSIA, the foreign sovereign has "immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C.Cir.2000) (quoting *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C.Cir. 1990)). The special circumstances of a foreign sovereign require the court to engage in more than the usual pretrial factual and legal determinations. *Foremost–McKesson*, 905 F.2d at 449. The D.C. Circuit has noted that it is particularly important that the court "satisfy itself of its authority to hear the case" before trial.

*Id.* (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C.Cir.1984)).

Once a foreign-sovereign defendant asserts immunity, the plaintiff bears the burden of producing evidence to show that there is no immunity and that the court therefore has jurisdiction over the plaintiff's claims. *Daliberti*, 97 F.Supp.2d at 42 (citations omitted). A court may dismiss a complaint brought under the FSIA only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Id.* (citations omitted). Once the plaintiff has shown that the foreign defendant is not immune from suit, the defendant bears the burden of proving that the plaintiff's allegations do not bring the case within one of the statutory exceptions to immunity. *Phoenix Consulting*, 216 F.3d at 40.

The exception to foreign sovereign immunity at issue in this case is the state-sponsored terrorism exception, codified at 28 U.S.C. § 1605(a)(7), that Congress enacted as part of the comprehensive Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, § 221(a), 110 Stat. 1214 (Apr. 24, 1996), which provides that foreign sovereigns are not immune when

> [m]oney damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency[.]

28 U.S.C. § 1605(a)(7). The statute gives three additional requirements for the exception to apply: (1) the foreign state must be designated as a state sponsor of terror-

ism at the time the act occurred or was designated as such as a result of such an act; (2) the plaintiff must afford the foreign state a reasonable opportunity to arbitrate the dispute if the act occurred within that state's territory; and (3) either the claimant or the victim must have been a United States national at the time the act occurred. 28 U.S.C. § 1605(a)(7)(A)-(B).

On a Rule 12(b)(1) motion to dismiss in an FSIA case, the defendant may challenge either the legal sufficiency or the factual underpinning of an exception. *Phoenix Consulting*, 216 F.3d at 40. Given that a foreign-state actor's entitlement to immunity from suit is a critical preliminary determination, the parties have the responsibility, and must be afforded a fair opportunity, to define issues of fact and law, and to submit evidence necessary to the resolution of the issues. *Foremost–McKesson*, 905 F.2d at 449 (*citing Gould, Inc. v. Pechiney Ugine Kuhlmann & Trefimetaux*, 853 F.2d 445, 451 (6th Cir. 1988)). Thus, the court must resolve the substantive immunity-law issues of section 1605 before reaching a decision on subject-matter jurisdiction. *Id.* (citations omitted).

■ If the defendant challenges the legal sufficiency of the plaintiff's jurisdictional allegations, the court should accept the plaintiff's factual allegations as true and determine whether such facts bring the case within any of the exceptions to foreign-state immunity invoked by the plaintiff. *Id.* This standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C.Cir. 2002) (*"Price I"*). The plaintiff need not set out all of the precise facts on which he bases his claim to survive a motion to dismiss. *Id.*

■ If the defendant challenges the factual basis of the court's jurisdiction, however, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff. *Phoenix Consulting*, 216 F.3d at 40. Instead, the court must resolve any disputed issues of fact, the resolution of which is necessary to a ruling upon the motion to dismiss. *Id.*; *Price I*, 294 F.3d at 90; *Foremost–McKesson*, 905 F.2d at 449. The court has "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," but it must give the plaintiff "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Phoenix Consulting*, 216 F.3d at 40 (quoting *Prakash*, 727 F.2d at 1179–80). To avoid burdening a foreign sovereign that proves to be immune from suit, however, the court should carefully control and limit jurisdictional discovery. *Id.*; *Foremost–McKesson*, 905 F.2d at 449.

### 2. This Court Can Review Whether it Has Subject–Matter Jurisdiction

■ Some confusion exists between the parties in interpreting the holding of *Simpson II* on subject-matter jurisdiction. *Compare* Def.'s Mot. to Dismiss ("Def.'s Mot.") at 6 (challenging subject-matter jurisdiction) *with* Pls.' Opp'n at 1–3 (claiming that the defendant cannot now challenge subject-matter jurisdiction). The court in *Simpson II* summarized its overall holding as follows:

> As Simpson's offer to arbitrate afforded Libya a reasonable opportunity to arbitrate Simpson's claim, there is no jurisdictional flaw barring Simpson's complaint, and we affirm the District Court with respect to this issue. Nevertheless, Simpson fails to state a claim for torture

as that term is used in the FSIA and the TVPA, and we reverse as to that claim. Simpson likewise fails to state a claim for hostage taking as that term is used in the FSIA and the ICATH. Because it appears possible that Simpson might be able to allege facts supporting a claim that Libya intended to compel action or inaction by a third party as a condition of Simpson's release, we vacate the District Court's decision with respect to the hostage-taking claim and remand to allow Simpson an opportunity to amend her complaint.

*Simpson II*, 326 F.3d at 235.

The plaintiffs take the appellate court's statement that "there is no jurisdictional flaw barring Simpson's complaint" to mean that no challenges remain to subject-matter jurisdiction in this case and that this court can only determine whether the plaintiffs have stated a claim under the standards of Rule 12(b)(6). Am. Compl. ¶ 13; *see also* Pls.' Opp'n at 1 (arguing that all jurisdictional issues have been settled and that the only remaining claims for the defendant to challenge are under Rule 12(b)(6)). Libya, on the other hand, maintains that the holding in *Simpson II* does

not foreclose further subject-matter jurisdiction review because the D.C. Circuit was only referring in the above quotation to the dispute between the parties regarding the offer to arbitrate.[2] Def.'s Mot. at 7.

The court agrees with Libya that the jurisdictional holding in *Simpson II* refers only to the reasonableness of the plaintiff's offer to arbitrate. Knowing that the plaintiff's offer to arbitrate was reasonable, however, does not conclusively determine whether the terrorism exception to the FSIA applies, because the reasonableness of the offer is only one of many requirements for that exception. The plaintiff must also show, *inter alia*, that she has suffered a "personal injury or death that was caused by an act of ... hostage tak ing[.]" 28 U.S.C. § 1605(a)(7). *Price I*, 294 F.3d at 85 (holding that properly stating a claim for one of the acts set out in 28 U.S.C. § 1605(a)(7) such as torture or hostage taking is required in order "to abrogate sovereign immunity and establish subject-matter jurisdiction"). Accordingly, this court is well within its discretion— and, indeed, duty bound—to determine whether it has subject-matter jurisdiction by evaluating the plaintiff's hostage-taking

**2.** As indicated above, the terrorism exception requires that the plaintiff afford the foreign-state defendant a reasonable opportunity to arbitrate the claim. 28 U.S.C. § 1605(a)(7)(B)(i); *Cicippio–Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1028–29 (D.C.Cir.2004). In *Simpson I*, the parties disputed the reasonableness of the plaintiff's offer to arbitrate and the court held that the offer was indeed reasonable. *Simpson I*, 180 F.Supp.2d at 83. *Simpson II* affirmed. 326 F.3d at 235.

It is understandable why confusion exists about whether the pleading of "torture" or "hostage taking" should be challenged under the rubric of subject-matter jurisdiction or as a cause of action and thus Rule 12(b)(6). When Ms. Simpson filed her original complaint, the D.C. Circuit had not explicitly ruled on whether the Flatow Amendment cre ated a cause of action against foreign states for torture or hostage taking. *E.g., Simpson II*, 326 F.3d at 233 n. 1 (noting the uncertainty regarding the Flatow Amendment as a cause of action against a state but not ruling on the issue). Many cases in this circuit thus proceeded as if the Flatow Amendment did indeed create that cause of action. Accordingly, parties often briefed "torture" and "hostage taking" under the rubric of Rule 12(b)(6), believing that one could assert a cause of action against a foreign state pursuant to 1605(a)(7) for such acts. As recent case law makes clear, however, "the terrorism exception to the FSIA is merely a jurisdictional provision and does not provide a cause of action against foreign states." *Acree v. Republic of Iraq*, 370 F.3d 41, 43 (D.C.Cir. 2004); *Cicippio–Puleo*, 353 F.3d at 1032.

claim.[3] *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (holding that, under the FSIA, "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state"); *In re Papandreou*, 139 F.3d 247, 255 (D.C.Cir.1998) (noting "the duty of courts to bring ... up [subject-matter jurisdiction] on their own"). Before coming to the plaintiffs' hostage taking, however, the court addresses a separate issue relating to subject-matter jurisdiction.

### 3. The FSIA is the Sole Source of Subject–Matter Jurisdiction For Claims Against a Foreign Sovereign

■ The plaintiffs list several statutes under which they purport to establish this court's subject-matter jurisdiction: 28 U.S.C. § 1605(a)(7) of the FSIA, the ATS, 28 U.S.C. § 1350, and 18 U.S.C. § 2333(a) (providing a cause of action for certain acts of terrorism). Am. Compl. ¶¶ 6–7. However, only the FSIA (and, coextensively, 28 U.S.C. §§ 1330(a) and 1331) can provide subject-matter jurisdiction in a case against a foreign sovereign, and any suit against a foreign sovereign must therefore fit under one of the FSIA's exceptions to immunity. *Amerada Hess*, 488 U.S. at 438, 109 S.Ct. 683; *Verlinden B.V. v. Cent.*

*Bank of Nigeria*, 461 U.S. 480, 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Furthermore, 18 U.S.C. § 2337(2) bars the use of § 2333 in suits against foreign states. 18 U.S.C. § 2337(2); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54, 60 (D.D.C.2003) (stating that § 2337(2) "clearly precludes" a plaintiff's claim against a foreign state under § 2333). Finally, the ATS does not provide jurisdiction over foreign states.[4] *Amerada*, 488 U.S. at 438–39, 109 S.Ct. 683 (determining that "the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court"). In this case, therefore, subject-matter jurisdiction can exist only through the proper application of § 1605(a)(7) of the FSIA. Accordingly, the court now turns to the application of that provision.

### 4. The Court Denies the Defendant's Rule 12(b)(1) Motion to Dismiss Because the Plaintiffs Sufficiently Plead Hostage Taking

■ The FSIA defines "hostage taking" according to how that term is used in Article 1 of the International Convention Against the Taking of Hostages ("ICATH"). 28 U.S.C. § 1605(e)(2). As the D.C. Circuit stated in *Simpson II:*

---

**3.** In their complaint, the plaintiffs state that the defendant waived its opportunity to challenge subject-matter jurisdiction. Am. Compl. ¶ 12. The defendant disputes this contention. *E.g.*, Def.'s Mot. at 5. The court rejects the plaintiffs' argument because the court has an independent duty to establish subject-matter jurisdiction. *In re Papandreou*, 139 F.3d 247, 255 (D.C.Cir.1998). Nor does the court read the plaintiffs' complaint to argue that the defendant waived its immunity pursuant to 28 U.S.C. § 1605(a)(1), an argument that the court would also reject. *See* Def.'s Mot. at 5.

**4.** Although the Supreme Court recently declared that the ATS is jurisdictional, *Sosa v. Alvarez–Machain*, —— U.S. ——, ——, 124 S.Ct. 2739, 2755, 159 L.Ed.2d 718 (2004), such jurisdiction does not pertain to suits involving foreign-state defendants, because in such cases the plaintiff must first prove jurisdiction under the FSIA before any claims under the ATS can proceed. *Amerada*, 488 U.S. at 439, 109 S.Ct. 683; *Soudavar v. Islamic Republic of Iran*, 67 Fed.Appx. 618, 619–20, 2003 WL 21401768, *1–2 (D.C.Cir.2003); *see also Hwang Geum Joo v. Japan*, 332 F.3d 679, 687 (D.C.Cir.2003) (holding that "whatever else the Alien Tort Statute might do, it does not provide the courts with jurisdiction over a foreign sovereign. Only the FSIA can provide such jurisdiction") (D.C.Cir.2003) *vacated on other grounds*, —— U.S. ——, 124 S.Ct. 2835, 159 L.Ed.2d 265 (2004).

"Hostage taking" occurs under the ICATH (and so under the FSIA) when a person "seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party ... to do or abstain from doing any act as an explicit or implicit condition for the release of a hostage." Article I, ICATH, U.N. GAOR, Supp. No. 39, U.N. Doc. A/34/39 (1979). The essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the convention. *Price [I]*, 294 F.3d at 94. *Simpson II*, 326 F.3d at 234–35; *Price I*, 294 F.3d at 94 (holding that a complaint failed to state hostage taking—even under a deferential standard of review—where the complaint pointed "to no nexus between what happened to [the plaintiffs] in Libya and any concrete concession that Libya may have hoped to extract from the outside world").

As to Ms. Simpson's original complaint, the D.C. Circuit held that although Ms. Simpson alleged "that she was held captive and incommunicado for several months," she failed to "allege that Libya's intended purpose behind her detention was to compel anyone to do or abstain from doing any act." *Simpson II*, 326 F.3d at 235. The D.C. Circuit therefore stressed that in her amended complaint Ms. Simpson must allege facts "supporting the proposition that Libya intended to compel action or inac-tion by a third party 'as an explicit or implicit condition' of [her] release." *Id.*

In their amended complaint, the plaintiffs offer four categories of allegations to support their hostage-taking claim: (1) use of the plaintiffs as human shields to prevent American air attacks; (2) revenge and compensation for American air attacks; (3) exchange for Egyptian military hardware; and (4) the defendant's pattern of terrorist activity. Am. Compl. ¶¶ 63–120. Libya strongly opposes these allegations, labeling some as false and others as irrelevant, prejudicial, or hearsay. Def.'s Mot. at 7–8. As to these categories of allegations, the court notes that it will consider only competent evidence, not conclusory statements or hearsay. *KVOS, Inc. v. Assoc. Press*, 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183 (1936) (holding that jurisdictional allegations must be supported by "competent evidence"); *Hutira v. Iran*, 211 F.Supp.2d 115, 123 (D.D.C. 2002). The court will not endeavor to resolve every evidentiary dispute, however, because the court need only determine whether sufficient evidence exists on which to base jurisdiction. As will be seen, the plaintiffs successfully produce just such a minimum of evidence through Mr. Nudell's expert opinion and affidavit and the U.S. State Department's publication *Patterns of Global Terrorism*.[5]

Rather than coming forward with its own evidence to refute hostage taking,[6] the

---

**5.** Courts have expressly recognized that *Patterns of Global Terrorism* "is an annual report highlighting worldwide patterns of terrorism, and reflects the formal and official position of the U.S. government with respect to responsibility for various terrorist acts." *Dammarell v. Iran*, 281 F.Supp.2d 105, 111 n. 6 (D.D.C. 2003). Neither this court nor the D.C. Circuit has questioned the admissibility of various State Department and CIA documents, but, rather, has denied similar Rule 12(b)(1) motions partially in consideration of the eviden-tiary weight of such documents. *Kilburn*, 277 F.Supp.2d at 33–34 (citing as evidence the State Department's *Patterns of Global Terrorism* and the CIA publication *Libya: Reviewing Terrorist Capacities*), *aff'd*, 376 F.3d 1123 (D.C.Cir.2004).

**6.** *Cf. Kilburn*, 376 F.3d at 1132 (noting that "the Libyan defendants have so far satisfied neither a burden of production nor their required burden of persuasion. They submitted no affirmative evidence whatsoever to show

defendant challenges jurisdiction by attacking the quality of the plaintiffs's evidence. Thus, before proceeding to address the plaintiffs' evidence, the court addresses the defendant's argument that Mr. Nudell's expert opinion is not of any value because "it is not based on any independent knowledge relating to this case or to expertise on Libyan issues, evidence, or expertise on issues of terrorism and hostage taking." Def.'s Resp. to Pls.' Ju. Disc. at 5. Mr. Nudell states that in preparing his report he "relied on the documents [the plaintiffs] provided ... as well as my own knowledge of events relating to Libya and items in my own files and references." Pls.' Ju. Disc. tab 1 ("Nudell Report"). Although some of the documents Mr. Nudell relies on (e.g., newspaper articles) are almost certainly inadmissible, under Federal Rule of Evidence 703 the expert may rely on inadmissible evidence so long as experts in the same field reasonably rely on such evidence. FED.R.EVID. 703. The proper question, then, is whether experts in Mr. Nudell's field of foreign policy and terrorism analysis reasonably rely on newspaper articles to gather and analyze information on newsworthy events. The court determines that they do. *E.g., Katt v. City of New York*, 151 F.Supp.2d 313, 357 (S.D.N.Y.2001) (approving an expert report that relied, *inter alia*, on "books and newspaper reports" that the expert "had read in the course of over twenty years of academic research" and noting that "[s]uch data is of a type reasonably relied upon by experts in various disciplines of social science") (citing Bernard Phillips, Sociological Research Methods 255 (1985) (noting that "[t]he data of historical research span a wide range of types and generally include almost all of the kinds of data that sociologists have used for their investigations, [including] newspaper reports and dispatches [and] questionnaire and interview schedules")).[7] Accordingly, the court determines that Mr. Nudell's opinion is admissible evidence concerning the alleged hostage taking in this case as it impacts subject-matter jurisdiction.

### a. Use of the Plaintiffs as Human Shields to Prevent American Air Attacks

■ The plaintiffs' first set of allegations seek to demonstrate that Libya held the plaintiffs to prevent American air strikes. Am. Compl. ¶¶ 63–75. The plaintiffs begin with the terrorist attacks in airports in Rome and Vienna in December 1985 by an individual with alleged ties to

---

that they fall outside the terrorism exception. They did not, for example, file an affidavit denying that their agents purchased or killed Peter Kilburn").

7. *See also Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir.1998) (finding that a sociology professor's expert testimony on anti-cult movements permissibly relied on "newspaper articles, certain pretrial testimony and conversations with colleagues," in part because the professor also cited "to his extensive studies and to his collaboration with other academics as the basis for his opinions"); *Mann v. Univ. of Cincinnati*, 114 F.3d 1188, 1997 WL 280188, *2 (6th Cir. 1997) (finding, in a sexual harassment case, that a psychological expert's "review of a newspaper article discussing stalking charges [the plaintiff] filed against another woman was of the type of information allowed by FED.R.EVID. 703"); *Monia v. Parnas Corp.*, 278 Cal.Rptr. 426, 435 (1991) (holding that, in a malicious prosecution case, a professor of sociology testifying as an expert on "the motivations behind, and effects of, the phenomenon of Strategic Lawsuits Against Public Participation (SLAPP suits)" could base his expert opinion on "inadmissible hearsay contained in newspaper articles" because the defendant did not show that "newspaper articles are not the type of evidence on which experts in [the expert's] field reasonably rely in forming their opinions").

the Libyan government, and the bombing of a Berlin disco in April 1986 by alleged Libyan secret service agents. *Id.* ¶ 64. They then proceed to describe the American response to such attacks—for example, the plaintiffs claim that President Reagan announced economic sanctions against Libya, stated that America was prepared to take further steps if necessary, and described Americans remaining in Libya as "potential hostages." *Id.* ¶¶ 66–67. They recount the movement of American military ships into position in the Mediterranean and close to Libya and the launch in April 1986 of United States Air Force raids against targets in Libya, less than a year before the plaintiffs' own detainment in Libya. *Id.* ¶¶ 66, 69, 73. They also produce relevant diplomatic cables exchanged among the governments. of Washington, Brussels, Zurich, Cairo, and Paris during their detention to illustrate the degree to which Libya's unexplained detention of the plaintiffs prompted the at-

tention of foreign governments. Pl.'s Ju. Discov. Ex. 15.

The plaintiffs enumerate more facts, but those above constitute the set of facts cognizable as competent evidence. President Reagan's announcements and the intergovernmental cables are eminently recognizable through judicial notice.[8] And because the plaintiffs introduce the facts via the State Department publication *Patterns of Global Terrorism*, these facts also pass as competent evidence. The foregoing narrative thus sufficiently posits a *quid pro quo* or motive of the defendant to influence U.S. behavior by, during a time of crisis, detaining persons known by the defendant to be U.S. nationals and citizens with the hope of using them in the future to deter attacks.[9] Although the plaintiffs never allege that Libya issued an explicit demand for the hostages' release, Def.'s Mot. at 16, an allegation of "hostage taking" survives despite the lack of an explicit demand. *Simpson II*, 326 F.3d at 235 (remanding

8. Judicial notice is "a process by which a court takes recognition of a fact in the absence of formal proof," *United States v. Neill*, 964 F.Supp. 438, 446 (D.D.C.1997), and is appropriate when a fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED.R.EVID. 201(b). The parties have not requested that the court take judicial notice (or forbear therefrom), but because the court has discretion to take notice, the court does so as an expedient to resolve historical facts beyond dispute. *See* FED.R.EVID. 201(c).

9. The plaintiffs allege, and the defendant never denies, that Libya was aware of the nationalities of the parties aboard the *Carin II*. *See* Am. Compl. ¶ 18 (stating that the vessel sent a radio distress signal "in which the identities and nationalities of all passengers were made known"). Moreover, the fact that it is unclear whether third parties had notice of the captivity is not dispositive to hostage taking, because the defendant could have taken the hostages with the intent of announcing at

some point in the future to appropriate third parties that they had the hostages. *Cf. United States v. Lin*, 101 F.3d 760, 767 (D.C.Cir. 1996) (stating that although the defendants may have initially sought money from their hostages, the fact that they eventually sought money from third parties satisfied the *quid pro quo* requirement of hostage taking); *see also* Nudell Report at 2 (describing Libya's "attempt to create uncertainty in the minds of U.S. officials as to the welfare and whereabouts of the Cairn Party in order to discourage another bombing attack in which they might be injured or killed. Additionally, the implied threat that they might be killed in retaliation for any new attack was present"). Of course, in the absence of any announcement of the hostages by Libya to third parties, the supposed deterrent effect of possessing hostages lacks any utility. *See* Dr. Strangelove or: How I Learned to Stop Worrying and Love the Bomb (Columbia Pictures 1964) (discussing, *inter alia*, how a doomsday device cannot serve as an effective deterrent if the party to be deterred is unaware of the device).

for an articulation by the plaintiff of Libya's intention to compel action "as an explicit or implicit condition" of her release). The delicate choreograph of mutual assent that the defendant envisions may play well in the kabuki theater of contract law, but as applied to the rough-and-tumble stage of international relations (if, indeed, Libya's alleged behavior can be described as international relations) strikes the court as an unwelcome distraction. At the very least, the plaintiffs have demonstrated the plausibility of interpreting. Libya's actions as implicitly designed to avert further U.S. military strikes.

### b. Revenge and Compensation for American Air Attacks

■ The plaintiffs next allege that they were held as "revenge/compensation" for the air attacks mentioned above. Am. Compl. ¶¶ 76–80. As evidence, the plaintiffs begin with an intelligence report from October stating that the air attacks had not reduced Libya's support for terrorism but had instead led Libya "to wage a revenge campaign over a number of years." *Id.* ¶ 76. The plaintiffs also list three occasions on which Libya requested compensation or sought revenge for the air attacks: Libya's indictment of nine American officials for the air attacks, Libya's draft United Nations resolution seeking compensation from the United States, and "recent pronouncements" from Colonel Qadaffi and the Libyan government regarding compensation. *Id.* ¶¶ 77–80. The above rationale fails because Libya's alleged pursuit of retributive justice entails no form of exchange, nominal or substantive, between Libya and a third party. *Price I*, 294 F.3d at 94 (holding that deten-

tion for the purpose of moral symbolism is not hostage taking). Taking a hostage for personal satisfaction or to "right a wrong" ends the matter; a hostage taker in such circumstances does not expect further third party action because possession of the hostage is the goal in and of itself.[10]

### c. Exchange for Egyptian Military Hardware

■ The plaintiffs place their next set of allegations in the context of Libya's failed attempt to overthrow the government of Chad. Am. Compl. ¶¶ 81–102. The plaintiffs state that Egypt's relations with Libya deteriorated following the attempted overthrow. In late February 1987, a Libyan colonel and five airmen flew their plane to Egypt, seeking asylum. *Id.* ¶ 84. A second defection occurred on March 29, 1987, when three Libyan airmen flew their helicopter to Egypt, also seeking asylum. *Id.* ¶ 85. In response to these defections, and while the plaintiffs were being held in Libya, Hosni Mubarak, the president of Egypt, stated that he would not return the plane or helicopter unless Libya freed Egyptians held in Libya. *Id.* ¶ 86. Plaintiffs allege that a third defection occurred in July 1987, when a Libyan Air Force captain and two officers landed their helicopter in Egypt. *Id.* ¶ 98. As the plaintiffs allege,

[o]n information and belief, the defendant conditioned the release of the plaintiff and her companions either explicitly or implicitly on the return of Libya military personnel and material lost to Egypt. The refusal to allow the plaintiff to leave the country, having released her to the Belgian embassy, resulted from either a failure to fully consummate an

---

10. The court notes in this regard that the plaintiffs do not expressly claim that Libya took them hostage with the intent to compel future *monetary* compensation from a third party for their release. The compensation to

which the plaintiffs refer is instead of the intangible, immediate sort that presumably results from the gratification of taking and possessing a hostage. *E.g.*, Am. Compl. ¶ 79.

explicit transaction or the failure of Belgian, Egyptian or U.S. authorities to accept the *quid pro quo* for her release. *Id.* ¶ 92; *see also id.* ¶ 102 (stating that, "[o]n information and belief, Dr. Mostafa Karim, in part, was held until November 1987 for the return of Libyan military assets lost to Egypt in February and July 1987").[11] Plaintiffs further maintain that Dr. Karim, an Egyptian, was "held as a 'bargaining chip' against possible future losses of military assets to Egypt." *Id.* ¶ 93.

The three defections and President Mubarak's statement are matters of historical record, documented and recognized events, not mere speculative newspaper stories. As such, the court takes judicial notice thereof. Fed.R.Evid. 201. In light of such repeated losses of personnel and material to Egypt, it is reasonable to infer a motive of Libya to detain Dr. Karim as one Egyptian national among perhaps many others, thus facilitating a sort of collective bargaining strategy. *Cf. United States v. Lin*, 101 F.3d 760, 766–67 (D.C.Cir.1996) (upholding a finding of hostage taking where the defendants compelled a third-party to pay the debts owed to the defendants by hostages). Collectively, the evidence presents a plausible case for determining that the plaintiffs' detention represented one strand of a larger rope with which Libya hoped to lasso the defecting agents and material back under its control. *See also* Nudell Report at 3 (stating that "the presence of Mostafa Karim, a member of a prominent Egyptian family, in the Cairn Party offered Libya an opportunity to induce Egypt to return the aircraft without the concomitant release of the Egyptian military officers").

#### d. The Defendant's Pattern of Terrorist Activity

Finally, the plaintiffs point to Libya's "similar behavior of hostage taking and bargaining with Western interests for the release of their citizens[.]" Am. Compl. ¶¶ 103–120. For example, the plaintiffs mention (1) the May 1984 detaining of the Norwegian ship, *Germa Lionel,* and its crew and the release after Libyan authorities received payment; (2) Libya's release of two out of six British nationals in 1984 as a "goodwill gesture" to indicate that further British prisoners could be released in exchange for the release or better treatment of Libyans in British prisons; (3) a prisoner exchange between Italy and Libya on October 6, 1986; (4) Belgium's release in January 1991 of a prisoner in exchange for four Belgians seized in 1987; (5) Egypt's return of four fighter jets to Libya on March 1, 1988, in exchange for the return of thirty-six Egyptian detainees; and (6) Libya's release in April 1998 of an Italian couple held in Libya in exchange for Italy speaking out against international sanctions imposed on Libya. *Id.* ¶¶ 105–106, 110, 118–120. Although this argument fails as an allegation of hostage taking because it lacks a *quid pro quo*, instances of past acts of terrorism may be probative of the other allegations of hostage taking. *Cf.* Fed.R.Evid. 404(b) (noting, with regard to the "character of a person," that evidence of other crimes, wrongs, or acts, may be admissible to prove motive, opportunity, intent, etc.). Because the plaintiffs' other evidence of hostage taking is sufficient to establish

---

**11.** The plaintiffs further allege on information and belief that the Prime Minister of Belgium and President Mubarak "specifically discussed the possibilities that the Belgians could be included in his offer to trade planes for Egyptian prisoners." *Id.* ¶ 90. However, much of this discussion is intertwined with the plaintiffs' hearsay evidence regarding Belgian newspaper reports of pressure on the Belgium government to secure the release of the hostages. *Id.* ¶¶ 88–89.

subject-matter jurisdiction, however, the court need not rely on the defendant's alleged pattern of terrorist activity at this stage of the proceedings.

In conclusion, the court holds that the plaintiffs have come forward with competent evidence demonstrating that the defendant's purpose in the alleged hostage taking was "to compel a third party ... to do or abstain from doing any act as an explicit or implicit condition for the [hostages'] release[.]" *Simpson II*, 326 F.3d at 234 (internal quotations omitted). Accordingly, the court determines that it has subject-matter jurisdiction over this case. 28 U.S.C. § 1605(a)(7). The court now proceeds to analyze the remaining arguments in the defendant's motion to dismiss.

## B. The Court Has Personal Jurisdiction over Libya

■ Libya also contests the exercise of personal jurisdiction over it as a violation of the Due Process Clause of the Fifth Amendment. Def.'s Mot. at 25. The court need not linger long on this argument, for as the defendant concedes, binding law in this circuit is not in its favor. *Id.* (citing *Price I*, 294 F.3d 82). Indeed, as the court stated in *Price I*, "the Constitution imposes no limitation on the exercise of personal jurisdiction by the federal courts over [foreign sovereigns.]" 294 F.3d at 86. Accordingly, the court rejects Libya's personal jurisdiction argument.

## C. The Court Denies Without Prejudice the Defendant's Rule 12(b)(6) Motion

### 1. Legal Standard for Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C.Cir.2002). The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C.Cir. 2003) (citing FED.R.CIV.P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47–48, 78 S.Ct. 99 (internal quotation marks omitted). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), or "plead law or match facts to every element of a legal theory." *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C.Cir.2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C.Cir.2004); *Kingman Park*, 348 F.3d at 1040. Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations—including mixed questions of law and fact—as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C.Cir.2003); *Holy Land Found. for Relief & Development v. Ashcroft*, 333 F.3d 156, 165 (D.C.Cir.2003); *Browning*, 292 F.3d at 242. While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported

by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren,* 353 F.3d at 39; *Browning,* 292 F.3d at 242.

### 2. Ms. Simpson's Addition of the Estate of Dr. Karim as Co–Plaintiff Does Not Violate the Mandate Rule

■ The defendant contends that Simpsons' addition of Dr. Karim's estate to the action as a plaintiff violates the mandate of the D.C. Circuit in *Simpson II,* which, the defendant claims, limited amendment of the complaint to facts that Simpson—not Simpson and her deceased husband—might allege as probative of jurisdiction. Def.'s Mot. at 14–15. Compliance with the mandate rule entails no such consequence. The "mandate rule" is an application of the "law of the case" doctrine, which recognizes that a higher court's decision binds the lower court's consideration on remand of issues decided on appeal. *E.g., Maggard v. O'Connell,* 703 F.2d 1284, 1289 (D.C.Cir.1983). That said, the "law of the case" doctrine "does not seek to sweep under its coverage all possible issues arising out of the facts of the case." *United States v. Insur. Co. of N. Am.,* 131 F.3d 1037, 1041 (D.C.Cir. 1997). On the contrary, the only issues the reconsideration of which activate the doctrine are those decided "either explicitly or by necessary implication" by the higher court. *Id.*

Of the four issues comprising the D.C. Circuit's holding in *Simpson II,* none involves the question of the addition of Dr. Karim's estate as co-plaintiff. The defen-

dant—apparently applying the canon of construction of *inclusio unius est exclusio alterius*—argues that the court ordered Simpson (not Simpson and her deceased husband's estate) to amend her complaint. Def.'s Mot. at 14–15. But to infer exclusion of one thing (the estate of Dr. Karim) from the inclusion of another (Ms. Simpson) presupposes awareness by the court of the existence of the former. At no time did the possibility of the estate's addition arise. Clearly, the court never considered the question, and, therefore, the addition of the estate in no manner violates the mandate rule. *Insur. Co. of N. Am.,* 131 F.3d at 1041.

### 3. The Plaintiffs State a Claim on Which Relief Can Be Granted

■ The plaintiffs list a variety of torts on which they seek to recover compensatory damages from the defendants.[12] Am. Compl. ¶¶ 129–58 (specifying causes of action for false imprisonment, intentional and/or negligent infliction of emotional distress, assault, battery, loss of consortium and solatium, and loss of prospective inheritance). Libya argues that the plaintiffs, now unable to use the Flatow Amendment as a cause of action, cannot allege an alternative source on which to base a cause of action for the above claims. Def.'s Mot. at 3. Libya thus argues that the plaintiffs' complaint should be dismissed for failure to state a claim on which relief can be granted. *Id.* But Lybia places a greater burden on the plaintiffs than notice pleading requires. *Swierkiewicz,* 534 U.S. at 511–14, 122 S.Ct. 992; *Krieger,* 211 F.3d at 136.[13] Accordingly, the court denies Ly-

---

12. The court notes that the plaintiffs concede the defendant's argument that the plaintiffs may not recover punitive damages against a foreign state. *See* Def.'s Mot. at 25.

13. The court does not read *Acree v. Iraq* to have modified the threshold for surviving a Rule 12(b)(6) motion to dismiss. 370 F.3d 41 (D.C.Cir.2004). In *Acree,* the D.C. Circuit *sua*

*sponte* dismissed a complaint where the plaintiffs, like the plaintiffs in this case, relied on "generic" common law torts but did not specify "any other specific source in state, federal, or foreign law for their cause of action." *Id.* at 59. The D.C. Circuit ordered the parties "to consider this issue in preparation for oral argument," but it would seem

bia's motion to dismiss for failure to state a claim.

### 4. The Court Grants the Plaintiffs Leave to Amend Their Complaint

Although the court denies Lybia's motion to dismiss for failure to state a claim, the court believes that this litigation will proceed most efficaciously if the plaintiffs state the law for the causes of action they bring against Libya. In their amended complaint, the plaintiffs primarily reference general tort law. Am. Comp. ¶¶ 129–149; *see also id.* ¶¶ 150–158 (stating claims under various provisions of international law).[14] Generic tort law, the reference of which is sufficient to survive a motion to dismiss, is not a viable cause of action. *Acree*, 370 F.3d at 59. Accordingly, the court grants the plaintiffs leave to amend their complaint with a statement of which law they seek this court to apply. Aside from inserting the relevant law, the plaintiffs may not otherwise modify the complaint. Once the plaintiffs amend their complaint with a more specific cause of action, the defendant may bring a new challenge thereto.

### IV. CONCLUSION

For all these reasons, the court denies the defendant's motion to dismiss and grants the plaintiffs leave to amend their

that the parties showed up at court without doing their homework. *Id.* (noting that "[w]hen pressed repeatedly at oral argument, appellees offered no coherent alternative"). Thus, as the court stated, "[a]t oral argument, counsel for appellees gestured again toward generic common law torts, but generic common law cannot be the source of a federal cause of action." *Id.* Under those circumstances, and at a juncture in the litigation where the plaintiffs had obtained a "nearly-billion dollar default judgment against a foreign government whose present and future stability has become a central preoccupation of the United States' foreign policy," the

complaint to state with specificity their causes of action. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously issued this 7th day of March, 2005.

court found that "exceptional circumstances" justified dismissal for failure to state a claim. *Id.* at 58–59.

14. Because the chain of briefing on the instant motion to dismiss came to its terminus prior to the Supreme Court's decision in *Sosa*, —— U.S. ——, 124 S.Ct. 2739, 159 L.Ed.2d 718, the court postpones any consideration of the plaintiffs' ATS argument until the plaintiffs have amended their complaint and finalized their decision as to the law on which law they will base their causes of action.